JESÚS SANTA APONTE y OTROS, apelantes, *v.* HÉCTOR M. HERNÁNDEZ, SECRETARIO DEL SENADO DE PUERTO RICO(*) apelado.

*Número:* O-77-32 *Resuelto:* 1ro. de marzo de 1977

(*)NOTA DEL COMPILADOR: Véase el contenido del asterisco en la pág. 752 de este tomo.

*Miriam Naveira de Rodón,* abogada de los apelantes; *Héctor M. Laffitte, Héctor Martínez Muñoz* y *Santos P. Amadeo,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Plantea este litigio delicadas cuestiones de derecho constitucional. Requiere el examen y delimitación de las atribuciones de dos ramas de nuestro gobierno respecto a ciertas fases de nuestro ordenamiento jurídico. Exige precisar las relaciones entre diversas disposiciones de ley, entre instrumentalidades de nuestra ley y, en última instancia, aun entre el derecho y la propia sociedad.

El 30 de diciembre de 1976 el Tribunal Electoral de Puerto Rico certificó al señor Jesús Santa Aponte como senador por el distrito de Humacao. El 2 de enero de 1977 el señor Santa Aponte juró su cargo y se le dio asiento en la Alta Cámara el 10 de enero, fecha de comienzo de la Primera Sesión Ordinaria de la Octava Asamblea Legislativa. En ese mismo día, el señor Portavoz de la Mayoría en el Senado radicó una moción para impugnar la validez de las actas

---

(*)Coincidimos con el tribunal de instancia en que no procede acción judicial contra los miembros del Senado en virtud de la cláusula constitucional sobre inmunidad parlamentaria.

y del certificado de elección del señor Santa Aponte como senador por Humacao.

Dos días más tarde, por votación de catorce a trece, se dispuso no reconocerle al señor Santa Aponte la condición de senador hasta tanto se resolviese la moción del señor Portavoz de la Mayoría.

Poco después acudió el señor Santa Aponte y varios ciudadanos, electores del distrito senatorial de Humacao, ante el Tribunal Superior en solicitud de *injunction* para que fuera repuesto en su escaño. Tras diversos trámites el tribunal de instancia desestimó dicha solicitud. Se ha apelado ante nos de ese fallo.

La controversia en este caso gira en gran parte sobre el significado y linderos de la Sec. 9 del Art. III de la Constitución de Puerto Rico, en que se expresa:

"Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por la mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo. . . ."

Su fraseología suscita varias interrogantes: ¿A qué poder le corresponde interpretar esta disposición? ¿Posee jurisdicción este Tribunal para entender en este caso? ¿Se trata de un asunto justiciable? ¿Qué diferencia existe, si alguna, entre la exclusión y la expulsión de un miembro? ¿Constituye un poder absoluto el juzgar la validez de las actas y del escrutinio de la elección de los legisladores? Antes de encarar estas cuestiones, para analizarlas en su correcta perspectiva conviene repasar brevemente la historia de la disposición citada y de las actitudes que vienen desarrollándose hacia ella. Dicha historia explica buena parte de la interpretación de la cláu-

sula en aquellos países, como en Estados Unidos y Puerto
Rico, donde todavía se le retiene.

I

*Historial del Art. III, Sec. 9, de la Constitución de Puerto
Rico.*

La disposición que nos ocupa nace de unas circunstancias
históricas específicas; se robustece y difunde a otros países;
llega a alcanzar tonalidades de principio inmutable, reflejo
del orden natural de las cosas; y luego comienza a cuestio-
narse su sabiduría, a limitársele y, en algunas instancias, a
sustituírsele. El principio se remonta a olvidadas querellas,
a la lucha entre la Cámara de los Comunes inglesa y a la
Corona durante el Siglo XVI. Originalmente era el Rey,
atendido de su Consejo, quien determinaba las cuestiones
relativas a la elección de los miembros de la Cámara. En 1553
se da el primer caso en que la Cámara de los Comunes logra
arrogarse el poder de enjuiciar unas elecciones y excluye a
un diputado. T. Taswell-Langmead's *English Constitutional
History* 142–143 (11th ed., Plucknett 1960) ; Maitland, *The
Constitutional History of England,* Cambridge Univ. Press,
1963, págs. 247–248. Para fines del Siglo XVII la Cámara de
los Comunes resentía cualquier interferencia por el Rey, la
Cámara de los Lores o los tribunales de justicia. La eviden-
cia histórica, no obstante, es que las decisiones de la Cámara
de los Comunes sobre asuntos eleccionarios obedecían a me-
nudo a criterios puramente políticos. Maitland, *op. cit.,* 291.

Las colonias norteamericanas continuaron la tradición
inglesa. Ellis, *Powell v. McCormack and the Power to Expel:
Some Unanswered Questions Regarding the Framers' Intent,*
5 Ga. L. Rev. 203, 213–235 (1971). Conforme al clima ideo-
lógico imperante, se dispuso en la Sec. 5 del Art. I de la Cons-
titución de los Estados Unidos:

"Cada Cámara será el único juez de las elecciones, resultado
de las mismas y capacidad de sus propios miembros . . . .

Cada Cámara adoptará su reglamento, podrá castigar a sus miembros por conducta impropia y expusarlos con el voto de dos terceras partes . . . ."

No se debatió en extenso esta disposición en la Convención Constituyente. Tenía para aquel momento categoría de dogma. Mancke, *Congressional Election Contests and Recount Proceedings: A Critical Difference*, 72 Dick. L. Rev. 433, 438 (1968); *The Records of the Federal Convention of 1787*, Farrand, ed., Yale Univ. Press, 1937, vol. II (140, 141), 155, 165, 166, 180 (245), 251 (256), 300, 305, 567, 592, 611, 613; vol. III, 252; vol. IV, 40, 42. Diversos comentaristas, hasta entrado el Siglo XX, tendieron a reforzar los matices de poder inherente e incuestionable a la cláusula citada. Story, *Commentaries on the Constitution of the United States*, 5ª ed. vol. 1, 1891, pág. 604; 1 Blackstone's Comm. 163, 178, 179; 1 Kent Comm. 220; Corwin, *The Constitution and what it means today*, 12th ed. (1ª ed. 1920), pág. 16.

La constitución británica, así como la estadounidense, influyeron en las constituciones francesas de 1791, 1793, 1795 y 1799. En la Constitución de 1791, por ejemplo, Tít. III, cap. I, Sec. V, era la Asamblea Nacional la que examinaba los poderes de los diputados. En el caso de las asambleas primarias francesas, sin embargo, los tribunales determinaban en última instancia la existencia de los requisitos necesarios para votar. Constitución de 1795, Art. 22.

La Constitución de Cádiz a su vez se inspiró directamente en el ejemplo francés de 1791 e indirectamente en el modelo británico. Véanse los Arts. 50 y 113. Arriazu, Torra, Diz-Lois y Diem, *Estudios sobre Cortes de Cádiz*, Univ. de Navarra, 1967, págs. 414, 446. No se permitió, al estilo inglés de la época, intervención alguna de los tribunales. Constituciones españolas posteriores les reconocieron también a las Cortes la facultad de examinar la legalidad de las elecciones y la aptitud legal de los individuos que las compusiesen. Constitución de 1869, Art. 45, ordinal segundo; Constitución de 1876,

Art. 34. Esta última Constitución, que era la que regía al desatarse la Guerra Hispanoamericana, expresaba en el artículo citado que "Cada uno de los Cuerpos Colegiadores . . . examina así las calidades de los individuos que le componen, como la legalidad de su elección." La Carta Autonómica de 1897, dictada a su amparo, le reconoció a la Cámara de Representantes poderes similares (Tít. IV, Art. 13).

De la fuente primaria británica, por dos corrientes tributarias distintas, nos llegó así a principios de este siglo el mismo antiguo concepto. La Ley Foraker de 1900 repitió en su Art. 30 el precepto básico que encierra la Constitución de Estados Unidos. El Art. 32 de la segunda Ley Orgánica reiteró la idea.

Para el tiempo de la Convención Constituyente hay evidencia de insatisfacción con el sistema de confiarle a un cuerpo político la tarea de juzgar las calidades de sus miembros y la validez de su elección. La Escuela de Administración Pública recomendó que se exigiera una mayoría de dos terceras partes tanto en el caso de exclusión como en el de expulsión, "pues de ese modo se otorga cierta protección a los miembros contra posibles excesos de la mayoría." *La Nueva Constitución de Puerto Rico*, Ed. U.P.R. 1954, pág. 378. No se acogió esta recomendación en las propuestas presentadas a la Convención Constituyente, ni en el texto de la Constitución. Véanse las Proposiciones Núm. 94, 103, 182 y 326, antecesoras del Art. 6 del borrador de Art. III que produjo la Comisión de la Rama Legislativa. 4 *Diario de Sesiones de la Convención Constituyente* 2580–2581. Donde hace eco la preocupación de la Escuela de Administración Pública es cuando, a sugestión del Dr. Leopoldo Figueroa, se requirieron tres cuartas partes de los miembros totales de una cámara, en vez de las dos terceras, para la expulsión de un legislador de su seno. 2 *Diario de Sesiones de la Convención Constituyente* 815. En las explicaciones que se circularon entre los miembros del Congreso durante el proceso de ratificación se

hizo hincapié en la protección brindada a las minorías en casos de expulsión, mayor que la reconocida en la Constitución de Estados Unidos y en la mayoría de las constituciones estatales. *Notes and Comments on the Constitution of Puerto Rico*, Washington, 1952.

Mientras tanto, montaba la crítica en diversas comunidades sobre la conveniencia del primitivo método inglés de erigir a la Cámara de los Comunes en guardián de la elección de sus propios miembros. Las injusticias cometidas en la propia Inglaterra por razón de puro orden político fueron notorias. Maitland, *op. cit.*, 370. Inicialmente se intentó aplacar la creciente inconformidad con dicho método mediante la creación de un comité de trece diputados que le impartiese cierto viso de imparcialidad al proceso. 10 Geo. III, c. 16. En 1839 la Cámara de los Comunes hizo concesiones adicionales. Maitland, *op. cit.*, 370–371.

En la propia cuna donde vio la luz la disposición que nos ocupa se llegó finalmente a la conclusión que lo más sabio era que la Cámara de los Comunes abdicase el poder que tan celosamente había atesorado por largos siglos. La situación actual en Inglaterra es que la validez de las actas y de la elección de los diputados se determina exclusivamente por la rama judicial. "Representation of the People Act 1949", sec. 107 *et seq.*, 12, 13 & 14 Geo. 6 c. 68, 11 Halsbury's *Statutes of England*, 3ra ed., 1969, pág. 695 *et seq.* Para versiones anteriores de este principio, véase: Maitland, *loc. cit.* Lo mismo ocurrió en Canadá y en Australia. Burdick, *The Law of the American Constitution*, 169, n. 2. La Constitución francesa de 1958 despoja de rango constitucional el poder bajo examen y establece que una ley orgánica regirá la materia. (Art. 25.)

En Estados Unidos se ha sugerido también que debe enmendarse la Constitución para privar al Congreso de ejercer esta facultad. MacNeil, *Forge of Democracy: the House of Representatives* 135 (1963); Schwartz, B., *American Consti-*

*tutional Law* 55 (1955); McEwen, *Contested Elections to the House of Representatives*, en Cleveland, ed. *We Propose: A Modern Congress*, 1966, págs. 225–234; véase la cita de textos adicionales en Mancke, *supra*, 72 Dick. L. Rev. 409, 439, n. 44 (1968). El camino escogido ha sido otro: establecer limitaciones, por legislación y jurisprudencia, al ejercicio de este poder. La *Federal Contested Elections Act* Pub. L. 91–138 de 5 de diciembre de 1969, 83 Stat. 284, 2 U.S.C. sec. 381 *et seq.*, enumera algunas reglas del juego para gobernar de antemano los procedimientos en estos casos y evitar decisiones *ad hoc.* La jurisprudencia, por su parte, forja salvaguardas para que no se violenten los derechos constitucionales de la minoría y de los electores. A ella aludiremos en más detalle en otras partes de esta opinión.

De lo anterior se desprenden algunas conclusiones de interés para el análisis de las cuestiones que siguen dentro del marco ideológico correcto.

■ En primer lugar, el poder de un parlamento de enjuiciar las calidades de sus miembros y la validez de su elección no es un poder inmanente, de orden universal, indispensable a la integridad y eficacia del proceso legislativo. Es un producto histórico; no es un postulado del derecho natural, un dictado irrefutable que la razón impone.

En segundo término, la historia nos enseña que la concesión irrestricta de tan vasto poder a un parlamento está preñada de peligros para las minorías, la regla del imperio de la ley y la salud de la democracia.

En tercer lugar, hemos observado dos reacciones principales a dichos peligros. La primera, cuyo ejemplo más señalado es el propio país que origina la doctrina, consiste en estimar que la solución más prudente está en que el parlamento se desprenda totalmente del referido poder. La segunda, representada por Estados Unidos, prefiere rodear el poder en cuestión de determinadas garantías básicas. La primera le

niega dicha facultad al parlamento; la segunda lo despoja de su antiguo carácter absoluto.

Nuestra función no estriba en dictaminar cuál de estas dos posiciones es la más sabia. En Puerto Rico priva, como en Estados Unidos, una disposición constitucional derivada de la original inglesa. Bajo ella es que se analizan, sin olvidar su trasfondo, las cuestiones que a continuación discutimos.

## II

*La jurisdicción sobre la materia.*

La Constitución del Estado Libre Asociado de Puerto Rico ordena en su Art. V, Sec. 1, que: "El Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley." Esta disposición es prácticamente idéntica a la del Art. III, Sec. 1, de la Constitución de Estados Unidos. La jurisprudencia establece la relación de esta cláusula con la que le confiere a cada cámara la facultad de ser juez de la validez de las actas y del escrutinio de la elección de sus miembros.

El principio básico es que la segunda disposición no anula la primera. No se margina al Poder Judicial; no se le priva de jurisdicción sobre la materia. La función de ser intérprete final de la Constitución le corresponde exclusivamente a un solo poder, al Poder Judicial. La Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales. *Kilbourn* v. *Thompson,* 103 U.S. 168, 199 (1881); *Bond* v. *Floyd,* 385 U.S. 116, 131 (1966). Según el Tribunal Supremo de Estados Unidos expresó en *United States* v. *Nixon,* 418 U.S. 683, 703 (1974), ratificando a *Baker* v. *Carr,* 369 U.S. 186, 211 (1962):

"En el desempeño de obligaciones constitucionales determinadas, cada rama del gobierno debe interpretar inicialmente la Constitución y la interpretación de sus poderes por cada rama

merece gran respeto por parte de las otras. El asesor del Presidente, como hemos indicado, entiende que la Constitución le concede un privilegio absoluto de confiabilidad a todas las comunicaciones presidenciales. Muchas decisiones de este Tribunal, sin embargo, han reiterado inequívocamente la norma de *Marbury* v. *Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803) que 'es enfáticamente atributo y deber de la rama judicial la determinación de lo que significa la ley.' A la pág. 177, 2 L.Ed. 60.

. . . . . . . .

Nuestro sistema de gobierno 'exige en ocasiones que las cortes federales interpreten la Constitución de modo diferente a otras ramas del gobierno'. *Powell* v. *McCormack*, supra, a la pág. 549. Y en *Baker* v. *Carr*, 369 U.S. a la pág. 211 la Corte expresó:

> 'La determinación de si alguna materia ha sido confiada por la Constitución en cualquier medida a otra rama del gobierno o si los actos de dicha rama exceden la autoridad cedida representa de por sí un delicado ejercicio de interpretación constitucional y en tal carácter es responsabilidad de esta Corte como intérprete final de la Constitución.' "

En *Powell* v. *McCormack*, 395 U.S. 486, 513–514 (1969), se rechazó explícitamente el argumento que, dada la facultad de las Cámaras de juzgar las calidades y elección de sus miembros, no existía jurisdicción en el Tribunal Supremo para enjuiciar las circunstancias en que se había excluido a un legislador de su escaño.

■ Según señaló Alexander Hamilton, en resumen, los cuerpos legislativos no pueden convertirse en los jueces constitucionales de sus propios poderes. Es a los tribunales a quienes les toca interpretar las leyes y la Constitución. *The Federalist*, Núm. 78.

### III

*El carácter justiciable de la controversia.*

■ En *Powell* v. *McCormack*, supra, el Tribunal Supremo de los Estados Unidos resolvió que la Cámara de Representantes no tenía facultad alguna, no importa el número

de votos a favor, para excluir a un congresista debidamente electo, excepto en caso que no cumpliere con los requisitos constitucionales respecto a edad, ciudadanía y residencia. El Tribunal rechazó expresamente la contención de que la controversia no era justiciable por envolver una confrontación potencialmente embarazosa entre ramas de igual jerarquía del gobierno federal, afirmando (395 U.S. 486, 548–549):

". . . la determinación del derecho del peticionario Powell a ocupar su escaño requiere tan solo que se interprete la Constitución. Tal determinación es parte del rol tradicional impuesto a las cortes de interpretar la ley y no envuelve una 'falta del respeto debido a (una rama) gubernamental de igual jerarquía.' . . . Nuestro sistema de gobierno exige en ocasiones que las cortes federales interpreten la Constitución de modo diferente a otras ramas del gobierno. El alegado conflicto que pueda causar dicha adjudicación no puede justificar la evasión por los tribunales de su responsabilidad constitucional." (Traducción nuestra.)

*Powell* trata del poder de las Cámaras de juzgar la capacidad de sus miembros. Aquí está envuelto el poder de enjuiciar su elección. La diferencia no permite el rechazo del razonamiento de *Powell*. Aquí se trata también de interpretar la Constitución y las leyes del país.

El Art. VI, Sec. 4, de la Constitución del Estado Libre Asociado de Puerto Rico dispone, en parte:

". . . Todo funcionario de elección popular será elegido por voto directo y se declarará electo aquel candidato para un cargo que obtenga un número mayor de votos que el obtenido por cualquiera de los demás candidatos para el mismo cargo."

Véase también el Art. 391 del Código Político de 1902, 2 L.P.R.A. sec. 257. El Art. 20 de dicho Código, 2 L.P.R.A. sec. 4, provee, además:

"El certificado de elección constituye prueba fehaciente del derecho a ser miembro de la Cámara de Representantes para todos los efectos de su organización."

El análisis de estas disposiciones, junto a otras que discutimos en otra parte de esta opinión, específicamente el viejo

Art. 14 de la Ley Núm. 9 de 5 de mayo de 1953, 16 L.P.R.A. sec. 414, y el Art. 7-088 del Código Electoral, 16 L.P.R.A. sec. 2418, tan solo exige, como en *Powell,* el ejercicio de un poder propio de los tribunales. En *Roudebush* v. *Hartke,* 405 U.S. 15, 26, n. 23 (1972), se afirmó que la facultad legislativa de enjuiciar las calidades de los congresistas se restringe en *Powell* a las que expresa la Constitución, pero que entre ellas debe contarse, como es natural, la de ser electo. La disposición citada del Art. VI, Sec. 4, de la Constitución de Puerto Rico corresponde en este respecto a la enmienda decimoséptima de la Constitución de Estados Unidos. Las cuestiones que plantea el presente recurso son claramente justiciables a la luz de los criterios expuestos en *Powell.* Como bien se dijo en *Baker* v. *Carr,* 369 U.S. 186, 209 (1962):

". . . El mero hecho que el pleito busca la protección de un derecho político no quiere decir que el mismo presenta una cuestión política."

Véase: Matthews, F. L., *Adam Clayton Powell's Exclusion from Congress: Increased Judicial Review of Legislative Action,* 24 U. Mia. L. Rev. 389 (1970); Bean, R. J., *The Supreme Court and the Political Question: Affirmation or Abdication?,* 71 W. Va. L. Rev. 97 (1969); *Legislative Exclusion: Julian Bond and Adam Clayton Powell,* 35 U. Chi. L. Rev. 151, 154–167 (1967); Fleishman, N. H., *Constitutional Law —Power of Congress to Exclude Persons Duly Elected,* 48 N.C. L. Rev. 655 (1970).

## IV

*Exclusión o Expulsión.*

Debe distinguirse inicialmente entre la exclusión y la expulsión de un legislador. La distinción es antigua. *Senate Election, Expulsion and Censure Cases From 1793 to 1972,* Sen. Doc. No. 92-7, 92d Cong., 1st Sess., *passim.* La misma se ha reconocido en Puerto Rico, González Gierbolini, M., *El Poder de las Cámaras Legislativas de Puerto Rico para*

*Determinar la Capacidad de Sus Miembros e Imponerles Medidas Disciplinarias Cuando Fuere Necesario*, tesis inédita, Facultad de Derecho, U.P.R. 1968, pág. 62 y 2ª de las conclusiones. Para la expulsión de un legislador, hemos visto que la Constitución de Puerto Rico exige la concurrencia de tres cuartas partes del número total de la Cámara concernida. Sólo puede ejercitarse el poder de expulsión por las causas que la Sec. 21 del Art. III señala para los juicios de residencia. Desde los primeros años de la Constitución de Estados Unidos se consideró permisible excluir por mayoría de votos a un legislador que no reuniese los requisitos que la Constitución impone para servir como tal. *Senate Election, Expulsion and Censure Cases*, supra, 1. En Puerto Rico, ya vimos que la Asamblea Constituyente descartó la propuesta de la Escuela de Administración Pública para que las exclusiones requiriesen igual número de votos que las expulsiones.

El apelante, señor Santa Aponte, alega que por motivo de haber jurado su cargo y haber comenzado brevemente a ejercer sus prerrogativas cesó todo poder del Senado de excluirlo; que puede tan solo expulsársele. En la vista oral se argumentó que aun de contarse de nuevo los votos y resultar que no tuvo mayoría, no puede el Senado recurrir al procedimiento de exclusión.

■ No le asiste razón al apelante. La toma del juramento por un legislador no despoja al Senado de su poder y obligación de juzgar las calidades de sus miembros. Willoughby, W. W., *The Constitutional Law of the United States*. 2ª ed., vol. 1, New York, 1929, págs. 603–604. Hemos aludido al hecho de que la elección de un legislador se cuenta entre los requisitos constitucionales que deben apreciarse para determinar la capacidad del legislador para servir como tal. *Roudebush*, supra, *loc. cit.* Es enteramente concebible que los hechos para fundamentar una impugnación por tal motivo o por ausencia de los otros tres requisitos no se manifiesten hasta después de la adjudicación inicial del escaño. Pueden mediar otras con-

sideraciones entendibles para que las Cámaras Legislativas resuelvan actuar después de iniciar sus labores. No es razonable resolver que en tales situaciones el Poder Legislativo tiene a su alcance tan solo el procedimiento de expulsión.

## V

*El Poder para Ordenar el recuento de los votos.*

 Impugnada oportunamente[1] la elección de un miembro de las Cámaras, el cuerpo legislativo correspondiente goza de poder constitucional exclusivo para decidir si ordena un recuento de los votos del legislador cuya elección se ha cuestionado. La Constitución le faculta para ser "el único juez de la ... validez ... y del escrutinio de su elección", y la decisión de si conviene hacer un recuento es parte indispensable de dicha facultad. *Reed* v. *County Commissioners*, 277 U.S. 376, 388 (1927).

## VI

*El modo de efectuar el recuento.*

 La disposición constitucional que inviste a las Cámaras con el poder de enjuiciar la elección de sus miembros está restringida por otras disposiciones legales. Ningún poder es absoluto en nuestro ordenamiento de ley. *Warner Lambert Co.* v. *Tribunal Superior*, 101 D.P.R. 378 (1973). Son altos los valores que están en juego: la integridad de nuestro proceso de gobierno, la cohesión y estabilidad de nuestra comunidad como sociedad respetuosa de la ley y del principio del imperio de la ley. No puede violarse el debido proceso de ley. *Barry* v. *Cunningham*, 279 U.S. 597, 620 (1928). El hecho desafortunado de que en Puerto Rico no se cuente todavía con

---

[1] No es necesario expresarse en este caso sobre los límites de tiempo a que pueda estar sujeto el trámite para impugnar una elección, dado el corto número de días transcurrido entre la certificación y la impugnación. La tardanza es a todas luces explicable. En el caso del Congreso, se dispone expresamente que las impugnaciones deberán radicarse dentro de los 30 días siguientes a la certificación de la elección. 2 U.S.C. 382(a).

reglas de procedimiento que rijan por igual en todos los casos obliga a que se extreme el celo para cumplir con el debido proceso de ley y evitar la más leve sombra de arbitrariedad o matiz partidista en el trámite de estas controversias, incluyendo el proveer para la custodia del material electoral, la debida participación de la minoría y de las partes en dicha función y en el recuento de los votos, y otros aspectos pertinentes relativos a la dilucidación de la impugnación presentada.

## VII

*La situación interina del apelante.*

Hasta tanto se adjudique definitivamente a quién le corresponde el escaño en disputa, el señor Santa Aponte tiene derecho a ocuparlo. Existen algunas autoridades en contrario, todavía bajo el influjo del viejo concepto absolutista inglés, sobre las dimensiones de esta facultad—*Barry,* supra, 614–615; Corwin, *The Constitution and What it Means Today,* 12ª ed. (1ª ed. 1920) pág. 16—pero la situación en Puerto Rico es clara. Abundando en las razones para mantener el status quo expresadas en la resolución interlocutoria que emitimos en este caso, la antigua Ley Electoral disponía lo siguiente respecto a impugnación (16 L.P.R.A. sec. 414) :

"En la vista de la causa el certificado de la Junta Estatal de Elecciones constituirá evidencia prima facie ¡del resultado ¡de la elección y el peso de probar el fundamento o fundamentos o su demanda recaerá sobre el contendiente o impugnador. . . ."

El actual Código Electoral provee (16 L.P.R.A. sec. 2418) :

"La radicación ante el Tribunal Electoral de una acción de impugnación del resultado de una elección, no tendrá el efecto de impedir que la persona sea certificada como electa y tome posesión del cargo y desempeñe el mismo, hasta tanto el Tribunal Electoral o el Tribunal Supremo de Puerto Rico determinare u ordenare su remoción del mismo. En el caso ¡de los senadores y representantes, de haberse presentado a tiempo algún escrito de impugnación, no se certificará la elección del candidato impug-

nado hasta que el Tribunal Electoral resuelva dicha impugnación, lo cual se hará no más tarde del día primero de enero siguiente a una elección general."

En este caso se impugnó ante el Tribunal Electoral la elección del señor Santa Aponte y el Tribunal Electoral, luego de examinar y dilucidar los planteamientos, lo certificó el 30 de diciembre de 1976. Nuestra Ley de Evidencia, 32 L.P.R.A. sec. 1887(14), establece una presunción al efecto que "una persona en posesión de un cargo público, fue elegida o nombrada para dicho cargo, en debida forma." Todas estas presunciones legales, aun cuando son de carácter *juris tantum* y susceptibles de ser desvirtuadas por otro medio de prueba, constituyen una declaración de derecho fundada en las consecuencias lógicas de la celebración y resultados oficiales de las elecciones efectuadas al amparo de las diversas disposiciones de ley precontenidas en el Código Electoral. No pueden ser descartadas sin prueba, ya que están formuladas y revestidas de un claro interés público pues brindan eficacia a dos postulados constitucionales, a saber: la adecuada representación de electores del Distrito Senatorial de Humacao y la composición y estabilidad inicial de la Rama Legislativa. Ello nos lleva a concluir que el Sr. Santa Aponte, por ley tiene derecho a ocupar su escaño de Senador hasta tanto se pruebe que no obtuvo los votos necesarios para justificar su condición de miembro del Senado. Tal acción se ajusta al uso que ha caracterizado la práctica de la Asamblea Legislativa de Puerto Rico en la abrumadora mayoría de los casos desde comienzos de siglo. En las elecciones de 16 de julio de 1917, Santiago Iglesias impugnó con éxito el escrutino de los votos de Veve Calzada. Durante el tiempo que tomó dilucidar la impugnación, el Senado se abstuvo de ordenar que Veve Calzada abandonase su escaño. Ello se hizo tan solo, y por unanimidad, al comprobarse que la persona verdaderamente electa había sido Santiago Iglesias Pantín. *Actas del Senado,* 1917, págs. 4–5; 69, 79.

Igual sucedió al impugnarse, a veces con éxito y otras no, la elección de Epifanio Fiz, la de Agustín López Cases, la de Francisco Grevi, la de José Zambrana, *Actas de la Cámara*, 1921, págs. 6–7, 69, 77–78, 107, 111, 773–778, 916–919, la de Antonia Cabassa Vda. de Fajardo, y las de Jesús Rodríguez Benítez y Angel A. Loyola, 2, I *Diario de Sesiones de la Asamblea Legislativa*, págs. 575–582, 678–687 (1953). Unicamente se les negó asiento a Dávila Polanco y Feliú Pesquera durante la investigación de fraude(²) en la inscripción de un partido y a Luis Angel Torres por carecer del requisito de edad constitucional. 14, III *Diario de Sesiones de la Asamblea Legislativa*, págs. 4, 16, 1474–1489 (1961), *Diario de Sesiones de la Cámara*, 10 de enero de 1973. En el caso del senador J. Maldonado, éste solicitó licencia para no ejercer sus funciones hasta tanto se aclarasen ciertos cargos en su contra. Se le concedió, aunque mediaron objeciones por parte de la minoría a base de que según su interpretación de los hechos en realidad se le estaba excluyendo o expulsando antes de que los cargos se ventilasen. *Diario de Sesiones del Senado*, 12 a 16 de febrero de 1973. La exclusión del señor Santa Aponte de su escaño hasta tanto se efectúe un recuento de los votos es el primer caso de tal naturaleza en este siglo.

En lo que respecta a la práctica del Senado de Estados Unidos se estima actualmente que el procedimiento correcto es permitir que el senador electo jure su cargo, sin perjuicio de la investigación que a continuación se realice. *Senate Election, Expulsion and Censure Cases, op. cit.*, VII.

## VIII

*Conclusiones.*

Por las razones que anteceden se resuelve que este Tri-

---

(²) Debe recalcarse que en estos dos casos, más que una simple alegación de fraude, la Asamblea Legislativa tenía ante sí prueba de ello surgida en ocasión de investigaciones realizadas por el Departamento de Justicia y en proceso de ventilación ante los tribunales. 14 *Diario de Sesiones*, Parte III 1961, 1474–1489.

bunal tiene jurisdicción para conocer de este caso; que el mismo es justiciable; que se trata de un caso de exclusión y no de expulsión; que el Senado goza de poder para ordenar el recuento de los votos emitidos en favor de los señores Santa Aponte y Estrada Bibiloni para determinar la elección del uno o del otro; que en el descargo de dicha función puede aprobar las reglas correspondientes, sujeto a las limitaciones y garantías que imponen la Constitución y las leyes del Estado Libre Asociado de Puerto Rico; y que, hasta tanto se determine finalmente quién obtuvo la mayoría de votos, el senador Santa Aponte tiene derecho a disfrutar todas las prerrogativas de su cargo.

*Se dictará sentencia revocando la del Tribunal Superior.*

El Juez Asociado Señor Martín disiente en opinión separada. El Juez Asociado Señor Negrón García se une a la opinión del Tribunal en opinión separada.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 1ro. de marzo de 1977

Con la opinión del Tribunal reconociendo la facultad constitucional del Senado de Puerto Rico para ordenar el recuento de los votos emitidos en la elección cerrada habida entre los señores Jesús Santa Aponte y Francisco Estrada Bibiloni en el distrito senatorial de Humacao, reiterando además el derecho del primero a permanecer en su escaño legislativo mientras se efectúa, se logra plena realización al principio de igualdad ante la ley consagrado en nuestra Ley Fundamental y ordenamiento jurídico.

En el desempeño de nuestra función judicial, la ausencia de precedente específico no puede ser óbice para crear la norma apropiada y que demos validez y virtualidad—en sus manifestaciones jurídicas y morales—a las diversas disposiciones constitucionales y de ley que rigen el caso de autos. Lo

contrario representaría una concepción estrecha, ajena a la autoridad del Poder Judicial y a las reglas básicas de hermenéutica jurídica: ¿en qué antecedentes judiciales se basó la decisión de *Marbury* v. *Madison,* 1 Cranch 137 (1803)?

No existe un medio más claro de interpretar erróneamente una disposición legal que leerla literalmente, con abstracción de su razón, espíritu y motivos. Lamentablemente, algunas ideas se convierten con el tiempo en frases enquistadas o dogmas que mucho después dejan de provocar ulteriores análisis. Hace más de siglo y medio, el padre del derecho constitucional judicial norteamericano John Marshall, expresó:

"El lenguaje humano se caracteriza en que ninguna palabra, en toda situación, transmite a la mente una sola y definitiva idea; nada es más común que el uso de palabras en sentido figurado. Casi todo ensayo contiene palabras, que tomadas en su sentido riguroso, transmitirían un significado diferente al obviamente propuesto.

Para una interpretación justa, es esencial que muchas palabras que conllevan algo en exceso, se entiendan en su sentido más mitigado—en el sentido que su uso común justifica." *McCulloch* v. *Maryland,* 4 Wheat 316, 407 (1819).

Así ocurre con el texto constitucional ante nos. Al disponer que "cada cámara será el *único juez* de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección"(1) consagra un poder eminentemente juridicial. Concluir que de su faz, una actuación al amparo de la misma trasciende los límites jurisdiccionales de este foro judicial, es hacer caso omiso de su historial y de los preceptos de igualdad que inspiran el desarrollo de la doctrina constitucional contemporánea sobre el derecho al voto: *Baker* v. *Carr,* 369 U.S. 186 (1962) y *Powell* v. *McCormick,* 395 U.S. 486 (1969). Resolver que el ejercicio de dicha autoridad

---

(1) Por *acta* debe entenderse la "certificación en que consta el resultado de la elección" y por *escrutinio,* el "reconocimiento y regulación de los votos". *Diccionario Real Lengua Española,* Décimonovena Ed., págs. 21, 562.

abarca una materia no justiciable, investida de una discreción absoluta, sin límites razonables, es convertirla en una prerrogativa mágica, rodeada de atributos divinos o naturales, incompatibles y extraños a nuestro andamiaje constitucional.

Para el jurisprudente, el concepto discreción, aun con referencia a una potestad de abolengo constitucional que no está específicamente reglada, necesariamente ha de nutrirse de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna. Como fuente integral del proceso de decisión que contribuye a dar sentido a la ley y a concretar en la realidad derechos individuales y colectivos, el uso por excelencia de un poder discrecional, intenta establecer un balance moral entre los polos opuestos en que se debaten algunas de las controversias humanas: el bien y el mal; la juridicidad y la violencia; la legalidad aparente y la ventaja indebida; lo prudente y lo irrazonable; la paridad y la desigualdad; lo espiritual y lo material; lo racional y lo pasional; y, la opresión y la libertad.

En armonía con lo expuesto, es claro que las presunciones sobre elección idónea, consignadas en el Código Político, (2) Código Electoral (3) y la Ley de Evidencia, (4) y que cobijan al co-apelante Santa en virtud de los cómputos electorales oficiales en orden a su *Certificado de Elección*, representan una deducción o conclusión que la ley expresamente dispone se haga. En ausencia de prueba en contrario, o de no ser válidamente controvertida, dicha presunción es un mandato legal que obliga a todo juez, inclusive al Senado, a actuar y pronunciar

---

(2) Art. 20, Código Político (2 L.P.R.A. sec. 4).

(3) Art. 7-083, Código Electoral (16 L.P.R.A. sec. 2413).

(4) Art. 464(14) Código Enjuiciamiento Civil, 1933 (32 L.P.R.A. sec. 1887(14)). *Cantellops* v. *Fernós, Comisionado*, 65 D.P.R. 807, 812 (1946); *García* v. *Cordero, Admor.*, 62 D.P.R. 315, 321–322 (1943).

cualquier dictamen interlocutorio o final a tenor del mismo. (5) Debe observarse que, en casos como el de autos, nuestra intervención apelativa versa sobre un asunto en que el cuerpo legislativo, por excepción, interviene como foro original en una capacidad adjudicativa judicial, esto es, en un rol distinto al clásico de aprobar leyes; en consecuencia sus decisiones deberán sostenerse en orden a una estricta juridicidad.

Toda presunción controvertible, *a priori* "crea un estado de probabilidad" o de "presunta verdad". *Martínez Cortés* v. *Tribunal Superior*, 98 D.P.R. 652, 656 (1970); *Quiñones Carrasquillo* v. *Quiñones*, 42 D.P.R. 307, 312 (1931). La suspensión del co-apelante prescinde de la presunción establecida en ley e invierte el valor probatorio lógico de la misma, violando de ese modo la cláusula sobre debido procedimiento. Nuestro análisis refleja que tal proceder se fundamenta en un hecho no demostrado, más bien de índole especulativo basado en unas proyecciones matemáticas. Es inconstitucional el que una legislatura promulgue una presunción cuyo hecho básico carezca del valor probatorio lógico: *Lot* v. *United States*, 319 U.S. 463 (1943). Por analogía, resulta inconstitucional que su dictamen judicial intente sostenerse sobre un criterio semejante, instaurador de por si de un estado negatorio de ley.

En segundo lugar, dicha remoción temporal es incompatible con el primer dogma consagrado en nuestra Ley Fundamental de que ". . . todo poder político emana del pueblo y se ejercerá con arreglo a su voluntad." Art. I, Sec. 1. El axioma de que la esencial igualdad en la reglamentación del derecho al voto es un requisito *sine qua non* para la validez del proceso electoral, *Giménez* v. *J.E.E.*, 96 D.P.R. 943, 947 (1968), se extiende hasta abarcar a los miembros del Poder Legislativo debidamente electos en igualdad de condiciones mediante un mismo e idéntico proceso de ley. No se puede negar tem-

---

(5) Arts. 460 y 462, Código Enjuiciamiento Civil, 1933, (32 L.P.R.A. secs. 1883 y 1885).

poralmente validez a la presunción que origina el *Certificado de Elección* del co-apelante, sin que forzosamente, por implicación e igual razonamiento, se niegue valor a los otros certificados y se desvirtúe la capacidad y permanencia de todos los demás miembros del Senado. Ello pone en entredicho la composición del cuerpo legislativo y debilita la estabilidad de las leyes regulatorias del ejercicio de la franquicia electoral.

Finalmente la suspensión decretada, aunque transitoria, constituye una medida innecesaria que priva indebidamente a todos los electores del distrito senatorial de Humacao, incluyendo los co-apelantes, del derecho constitucional a estar adecuadamente representados por dos senadores mientras se realiza el recuento, por la única circunstancia de haber uno de ellos prevalecido en la contienda electoral mediante una diferencia de pocos votos. Es contraria al principio cardinal de representación electoral igualitaria declarado en el apotegma "un hombre, un voto". El resultado inmediato y práctico es, que mientras los electores de los restantes siete (7) distritos senatoriales están cabal y completamente representados en el Senado, los del distrito de Humacao se encuentran desprovistos de tal delegación, menoscabándose injustificadamente el valor del voto de cada uno de ellos en una proporción de dos a uno (2:1).

"La justicia, esto es, dar a cada uno lo que es suyo, constituye la base más firme y perdurable del bienestar social y cuando en ella se inspira la Legislatura y dicta leyes dentro de sus facultades claramente tendientes a asegurarlo, la constitucionalidad de esas leyes debe ser vigorosamente sostenida por los tribunales, porque ellas están dentro de la letra vivificada por el espíritu de la Constitución. No fue un gobierno de clases, de privilegios el que la Constitución organizó. Fue un gobierno del pueblo, por el pueblo y para el pueblo el que quedó por ella consagrado." *M. Taboada & Co.* v. *Rivera Martínez, Comisionado,* 51 D.P.R. 253, 270 (1937).

En resumen, con tal acción se vulnera la garantía a la igual protección de las leyes, se niega validez al debido pro-

ceso y se quebranta el ejercicio de la prerrogativa electoral en tres dimensiones: (a) en lo concerniente al propio legislador incumbente; (b) con referencia a los electores que votaron por él; y (c) con respecto a *todos* los electores del distrito senatorial envuelto.

Lo expuesto contesta suficientemente cualquier interrogante o duda que pueda plantearse. Como decisión judicial, en un gobierno de ley y no de hombres, la suspensión provisional del co-apelante impidiéndole participar y votar en las deliberaciones del Senado—simplemente por haber sido elegido por un escaso margen de votos,[6] y haber determinado dicho cuerpo realizar un nuevo recuento en virtud de una mera solicitud del candidato competidor—[7] infringe varias disposiciones constitucionales de importancia al mantenimiento de nuestro régimen de vida democrático, y por ende, no puede prevalecer.

---

[6] Un miembro del Congreso norteamericano, comentando sobre el particular, expresa:

"Una votación cerrada en una elección general en ocasiones ha sido base para una disputa. Numerosas impugnaciones se han iniciado debido a la inexistencia de una decisión victoriosa en las urnas. Como regla general se puede decir que: a) El conteo oficial es evidencia *prima facie* de la regularidad y corrección de las actuaciones de los funcionarios electorales; b) Se presume que tales funcionarios han descargado fiel y honestamente sus deberes; c) El peso de la prueba y de producir evidencia en contrario recae sobre el impugnador; d) El fraude nunca se presume, debe ser probado; e) La estrechez en los resultados electorales no levanta ninguna presunción de fraude, irregularidad o deshonestidad." McEwen Robert, C., *Contested Elections to the House of Representatives*, pág. 229 (1966).

[7] No corresponde expresión alguna sobre la situación que plantea el haberse actuado en virtud de una petición escrita de impugnación formulada por uno de los miembros del Senado que oportunamente ejercitará la "función judicial". Actas del Senado correspondientes a los días 12 y 13 de enero de 1977.

—O—

Opinión disidente emitida por el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 1 de marzo de 1977

Disiento de la opinión emitida por el Tribunal en el día de hoy en que concluye (1) que la controversia planteada es justiciable (por no constituir una cuestión política) y (2) que el Senado de Puerto Rico no tiene facultad constitucional para excluir temporalmente al Sr. Jesús Santa Aponte como miembro de ese cuerpo hasta tanto se efectúe el recuento de votos emitidos en las elecciones para el cargo de Senador por el Distrito de Humacao.

Yo confirmaría la sentencia dictada por la Sala de San Juan del Tribunal Superior que desestimó la petición de interdicto presentada por los peticionarios apelantes que solicitaba la reposición del Sr. Jesús Santa Aponte en su cargo de Senador hasta tanto otra persona fuere debidamente certificada para dicho cargo. Al desestimar la petición el Tribunal Superior reconoció correctamente: (a) el poder del Senado de Puerto Rico bajo la autoridad conferídale por la Sec. 9 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico(1) para efectuar el recuento de los votos emitidos a favor de los Sres. Jesús Santa Aponte y Francisco Estrada Bibiloni para el cargo de Senador por el Distrito de Humacao; (b) el poder incidental del Senado para excluir de su escaño a un legislador, cuya elección fuere impugnada, hasta tanto se hubiere efectuado el recuento de los votos emitidos en su elección; (c) el poder del Tribunal Su-

_____

(1) "Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo. Cada cámara elegirá un presidente de entre sus miembros respectivos."

premo para intervenir en casos en que el Senado ejerza en forma arbitraria la facultad constitucional mencionada; y (d) la inmunidad de que gozan los Senadores bajo la cláusula de inmunidad parlamentaria que impide que se incluyan como demandados(²) en una acción de la naturaleza de ésta.

Para una mejor inteligencia del desarrollo del curso de este caso desde sus inicios me permito hacer una exposición de todo lo acontecido.

El Senador electo por el Distrito de Humacao para representante al Partido Popular Democrático y cuatro electores del mismo distrito presentaron una petición de interdicto ante el Tribunal Superior, Sala de San Juan, dirigida contra todos los Senadores electos por el Partido Nuevo Progresista, así como contra el Secretario y el Macero de dicho cuerpo, solicitando en esencia lo siguiente:

1. Que se ordenara la reposición del Senador Santa Aponte en su cargo de Senador hasta tanto otra persona fuere debidamente certificada para el cargo por el Tribunal Electoral o por el Tribunal Supremo de Puerto Rico, o hasta tanto fuere removido de dicho cargo de acuerdo a la ley o reglamento aplicable.

2. Que se prohibiera a la Comisión Especial (que fuera designada por el Senado para investigar todo lo relacionado con el resultado, las actas y el escrutinio de la elección en relación con los votos emitidos a favor de los señores Jesús Santa Aponte y Francisco Estrada Bibiloni, y para hacer un recuento de dichos votos) que tomara acción alguna para remover de su escaño al Senador Santa Aponte a menos que no fuera por motivo de: traición, soborno, otros delitos graves y aquellos delitos menos graves que impliquen depravación moral.

3. Que se ordenara a dicha Comisión Especial que no tomara acción alguna para obtener del Tribunal Electoral el material electoral relacionado con las Elecciones celebradas en el Distrito Senatorial de Humacao el 2 de noviembre de 1976.

4. Que la orden solicitada fuere dictada sin notificación previa a la parte demandada, ya que de no ser así dictada se causa-

---

(²) *Powell* v. *McCormack*, 395 U.S. 501–506 (1968).

ría y continuarían causándole serios perjuicios y daños irreparables a la parte demandante.

5. Que luego del entredicho provisional solicitado, se dictara un "injunction" preliminar prohibiendo las actuaciones señaladas y ordenando la inmediata reposición del Senador Santa Aponte, hasta tanto se decidiere sobre el "injunction" permanente.

Los fundamentos de derecho aducidos por los peticionarios en apoyo de la solicitud de interdicto se enumeran a continuación:

A. El Senado so color de autoridad bajo la disposición constitucional que crea el Senado de Puerto Rico, ha coartado y violentado los derechos constitucionales y estatutarios de los peticionarios en abierta demostración de arbitrariedad, capricho y discrimen político. Cita como jurisprudencia el caso de *Powell* v. *McCormack*, 395 U.S. 486, 514 (1969), escolio 27.

B. La parte demandada está impedida de violentar las certificaciones o determinaciones de hechos tomadas por el Tribunal Electoral con fecha 30 de diciembre de 1976 conforme al Art. 2-012 del Código Electoral de Puerto Rico (16 L.P.R.A. sec. 2032).

C. El Senado no tiene el poder para expulsar al Senador Santa a menos que concurran tres cuartas ($\frac{3}{4}$) partes de sus miembros y se lleve a cabo el procedimiento de juicio de residencia por las causales que se enumeran en la Constitución; y tampoco tiene el poder para designar una Comisión Especial para investigar la elección de dicho Senador por no autorizarlo las Secs. 9 y 21 del Art. III de la Constitución de Puerto Rico y los incisos 1, 2, 3, 4 y 11 del Art. 4-001 del Código Electoral (16 L.P.R.A. sec. 2131).

Junto a la petición de interdicto reseñada precedentemente los peticionarios presentaron copia de las Actas del Senado correspondientes a los días 10 y 12 de enero de 1977, o sea, del primer y segundo días de sesiones en las que se refleja lo ocurrido con respecto a la petición de recuento e impugnación del resultado, la validez de las actas y del certificado de elección del Sr. Jesús Santa Aponte como Senador por el Distrito Senatorial de Humacao y del escrutinio de su elección.

Las actas del Senado revelan que en el primer día de sesión—10 de enero de 1977—se procedió a la organización y constitución del Senado. Se llamó al orden y se dio lectura a la lista de Senadores electos en las elecciones generales celebradas en Puerto Rico el 2 de noviembre de 1976 según constaba de una certificación enviada a la Secretaría del Senado por el Secretario del Tribunal Electoral de Puerto Rico y de acuerdo con los certificados de elección expedidos por dicho Tribunal. Se informó que desde el día 2 de enero los señores Senadores habían prestado el juramento de rigor en la oficina del Secretario del Senado (refiriéndose al Secretario del anterior Senado). Autos originales, págs. 12–14.

En dicha sesión el Secretario informó que el Sr. Nogueras, Portavoz de la Mayoría, había formulado por escrito una petición de recuento e impugnación del resultado, la validez de las actas y del certificado de elección del señor Jesús Santa Aponte, como Senador por el Distrito Senatorial de Humacao, y del escrutinio de su elección. Se acompañó a dicha petición una moción sobre el mismo asunto. A ruego del Sr. Nogueras se acordó dejar la consideración de la anterior petición y moción para la próxima sesión a celebrarse el día 12 de enero. Se dispuso además que se entregara copia de los referidos documentos a todos los señores Senadores. Autos originales, págs. 19–20.

En el segundo día de sesiones el Secretario procedió a dar lectura a la siguiente Petición del Senador Nogueras:

"Asunto: Petición de Recuento e Impugnación del Resultado, la validez de las Actas y del Certificado de Elección del Sr. Jesús Santa Aponte como Senador por el Distrito Senatorial de Humacao y del escrutinio de su elección.

### PETICION

A los Honorables Miembros del Senado de Puerto Rico:

Comparece el Portavoz de la Mayoría del Partido Nuevo Progresista en el Senado del Estado Libre Asociado de Puerto Rico, por sí y en representación de todos y cada uno de los Sena-

dores que integran tal mayoría y respetuosamente alega, expone y solicita:

## HECHOS

1. Que el 2 de noviembre de 1976 se celebraron las elecciones generales en el Estado Libre Asociado de Puerto Rico, en las cuales eran candidatos a elección para Senador por el Distrito Senatorial de Humacao, los señores Jesús Santa Aponte, Francisco Estrada Bibiloni, Gilberto Rivera Ortiz y José A. Méndez Rodríguez;

2. Que el resultado total original de tal elección en relación con dichos candidatos a base de las Actas de Precinto, incluyendo el voto adelantado, en poder del Honorable Tribunal Electoral de Puerto Rico fue el siguiente:

| | Votos |
|---|---|
| 1. Dr. Francisco Estrada Bibiloni | 90,090 |
| 2. José A. Méndez Rodríguez | 89,980 |
| 3. Gilberto Rivera Ortiz | 89,639 |
| 4. Jesús Santa Aponte | 89,300 |

3. Que posteriormente en el escrutinio general del Honorable Tribunal Electoral, varias semanas después de las elecciones generales, el resultado anterior fue modificado, y el nuevo resultado fue el siguiente:

| | Votos |
|---|---|
| 1. Gilberto Rivera Ortiz | 92,287 |
| 2. Jesús Santa Aponte | 91,929 |
| 3. Dr. Francisco Estrada | 91,865 |
| 4. José A. Méndez Rodríguez | 91,710 |

4. Que todo el proceso de contar votos incluyendo el escrutinio general en la referida elección se efectuó manualmente, habiendo votado en el Distrito de Humacao más de Doscientos Mil electores;

5. Que el 28 de diciembre de 1976, el Partido Nuevo Progresista radicó ante el mencionado Tribunal una Moción detallando una serie de irregularidades y discrepancias en un total de 66 colegios de distintos precintos del Distrito Senatorial de Humacao, solicitando un recuento total de los mencionados colegios por entender que la adjudicación de votos en los mismos sería suficiente para cambiar el resultado preliminar en la elección de uno de los Senadores de dicho distrito.

6. Que al 7 de enero de 1977 el Partido Popular Democrático, en cuya papeleta electoral se encasilló los nombres de los Señores Santa y Rivera Ortiz, no había contestado la antes referida Moción y tampoco había emitido en relación con ésta, decisión alguna el mencionado Tribunal.

7. Que el 29 de diciembre de 1976 se efectuó un examen de algunas actas de Colegio que reflejaban diferencias numéricas al compararse con actas o resultados en poder del Partido Nuevo Progresista, en cuya papeleta electoral se encasilló a los señores Francisco Estrada y José Méndez. En tal examen surgieron 10 instancias en que se comprobó errores de los técnicos en la unidad de estadísticas del Tribunal Electoral, al anotar los resultados para candidatos a Senador por el Distrito de Humacao. Es decir, de un total de 60 actas examinadas, surgió un 16.6% de equivocaciones por técnicos de dicho tribunal, que de proyectarse al Distrito completo, alteraría el número de votos obtenidos por los señores Santa y Estrada, en favor de este último.

8. Que ese mismo día 29 de diciembre de 1976 los partidos políticos mencionados y el Auditor del Tribunal Electoral recomendaron el recuento total de tres colegios, de los cuales solo se recontó uno, al hacer caso omiso de tal recomendación el Tribunal Electoral;

9. Que de la revisión efectuada el 29 de diciembre de 1976 surgió [sic] 28 discrepancias en las actas de 60 colegios examinados al compararlas con los votos realmente emitidos por los electores en éstos. Ello significa aproximadamente una discrepancia en cada dos colegios en un Distrito en el cual había cerca de dos mil colegios electorales;

10. Que el Tribunal Electoral no ha sometido todavía al Partido Nuevo Progresista un acta certificada del total de discrepancias anotadas a nivel de los candidatos a Senadores por el Distrito de Humacao, ni de los resultados finales de dicho Distrito.

11. Que la diferencia en votos anunciado por un técnico del Tribunal la noche en que se certificó al Sr. Santa Aponte fue de 52 votos;

12. Que el 30 de diciembre de 1976 el Tribunal Electoral certificó al Sr. Jesús Santa Aponte como Senador electo por el Distrito Senatorial de Humacao.

13. Que en el Precinto de Humacao 93 al compararse las actas de colegio usados en las elecciones generales y las actas

de escrutinio general hechas en el Tribunal Electoral, aparecieron entonces más diferencias favoreciendo alegadamente con 176 votos más al Sr. Santa Aponte y con 81 votos menos al Dr. Estrada.

14. Que las actas de escrutinio en poder del Partido Nuevo Progresista reflejan el siguiente resultado en relación con tales candidatos:

| | Votos |
|---|---|
| 1. Gilberto Rivera Ortiz | 92,214 |
| 2. Francisco Estrada Bibiloni | 91,989 |
| 3. José A. Méndez Rodríguez | 91,952 |
| 4. Jesús Santa Aponte | 91,824 |

15. La alegada elección del Sr. Jesús Santa Aponte como Senador por el Distrito de Humacao ha sido impugnada por el Partido Nuevo Progresista ante el Honorable Tribunal Electoral, encontrándose pendiente de consideración por éste, una Moción a tales efectos radicada por dicho Partido el 7 de enero de 1977;

16. Que el Sr. Francisco Estrada Bibiloni se ha dirigido a este Senado, por mediación del Secretario del mismo, reclamando su escaño como Senador electo por el Distrito de Humacao e impugnando la validez del resultado y del Acta y Certificado de tal Elección expedido por el Tribunal Electoral al Sr. Jesús Santa Aponte y pidiendo un recuento total de los votos emitidos para Senador por el Distrito de Humacao a favor de dicho reclamante y del Sr. Santa Aponte;

17. Que las marcadas y continuas discrepancias y diferencias en el número de votos contados a favor del Sr. Estrada y el Sr. Santa y las alegaciones hechas por el Procurador Electoral del Partido Nuevo Progresista ante el Tribunal Electoral, unido al reducido margen de votos por el cual alega triunfó el Sr. Santa crean serias dudas sobre su derecho a ocupar y mantener su escaño como Senador por el Distrito de Humacao, quedando cuestionada la validez de las actas y del escrutinio de su elección.

## FUNDAMENTOS DE DERECHO

Alegan los peticionarios que:

El Senado de Puerto Rico, de acuerdo con lo dispuesto en la Sección 9 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico es el único juez de la capacidad legal

de sus miembros, de la validez de las actas y del escrutinio de su elección, razón por la cual tiene autoridad para entender en esta Petición de Recuento e Impugnación.

Existen precedentes en el ejercicio del derecho del Senado de Puerto Rico para resolver cualquier duda, impugnación o planteamiento sobre la capacidad legal, la validez de las actas y el escrutinio de la elección de sus miembros.

Tal situación ocurrió, por ejemplo, en la Primera Legislatura Ordinaria iniciada el 3 de agosto de 1917, al solicitar el Sr. Santiago Iglesias Pantín, del Senado de Puerto Rico que se practicara una investigación, se verificara el escrutinio procedente y que se expidiera un certificado de elección al candidato que obtuviera el mayor número de votos legales, cuestionando así el escaño del Sr. Santiago Veve Calzada. Dicha impugnación había sido infructuosamente hecha ante el entonces Consejo Ejecutivo quien certificó como electo al Sr. Veve Calzada.

En tal ocasión, el Senado de Puerto Rico designó una Comisión de Actas y Escrutinio, la cual después de un recuento de los votos emitidos, recomendó que se declarara electo al Sr. Santiago Iglesias Pantín y que se declarara nulo el certificado de elección expedido a favor del Dr. Santiago Veve Calzada. El Senado de Puerto Rico, un mes después, el 13 de septiembre de 1917, aprobó el Informe de tal Comisión.

Igual precedente existe en relación con la impugnación hecha en el Senado de Puerto Rico del Acta de Elección del Sr. Mario E. Dávila Polanco como Senador por Acumulación por el Partido Acción Cristiana, radicada el 9 de enero de 1961 en relación con las elecciones generales del 8 de noviembre de 1960.

En virtud de las anteriores alegaciones de hecho y de derecho, respetuosamente se solicita de este Honorable Senado lo siguiente:

1. Asuma jurisdicción sobre el asunto planteado en esta Petición y disponga que por el Macero se notifique copia de esta Petición al Sr. Jesús Santa Aponte;

2. Que se designe una Comisión Especial por el Presidente de este cuerpo, compuesta por cinco (5) senadores, para que a nombre del Senado investigue todo lo relacionado con el resultado, las Actas y el escrutinio de la elección celebrada el 2 de noviembre de 1976, en relación con los votos emitidos a favor del Sr. Francisco Estrada Bibiloni y el Sr. Jesús Santa Aponte, para Senador por el Distrito de Humacao, y que se efectúe un re-

cuento total de tales votos. Dicha Comisión Especial deberá rendir el correspondiente Informe al Senado con las recomendaciones que estime necesarias;

3. Que se requiera del Honorable Tribunal Electoral de Puerto Rico sus agentes, funcionarios y empleados produzca y entregue a tal Comisión todas las actas, certificaciones, votos emitidos y todos los documentos originales que la Comisión Especial determine sean necesarias, poniendo los mismos bajo la inmediata custodia de tal Comisión.

4. Que una vez rendido al Senado el correspondiente Informe de la Comisión Especial, este cuerpo legislativo actúe de conformidad con su facultad constitucional resolviendo lo que estime necesario."

Autos originales, págs. 35–39.

Acto seguido el Secretario dio lectura a la siguiente Moción del Senador Nogueras:

"Vista la Petición de Recuento e Impugnación del resultado de las Actas y del Certificado de Elección del señor Jesús Santa Aponte como Senador por el Distrito Senatorial de Humacao, y del escrutinio de su elección, y los serios y graves planteamientos que de la misma surgen, se propone que hasta tanto la Comisión Especial que ha sido nombrada rinda su informe al Senado, y hasta tanto este Cuerpo tome una acción final sobre el asunto, se deje en suspenso el reconocimiento de la condición de Senador por el Distrito de Humacao al señor Santa Aponte y no se le dé la continuada posesión de su escaño como tal Senador, reservándosele el derecho de comparecer ante la Comisión Especial que ha sido nombrada con el propósito de alegar contra la petición y sostener su derecho a ocupar dicho escaño en este Senado."

Autos originales, pág. 40.

Se procedió al debate sobre la petición y la moción citadas precedentemente, e hicieron uso de la palabra los señores Santa Aponte, López Soto, Marcano, Calero Juarbe, Rodríguez Torres, Ramos, las señoras Benítez de Rodríguez y Torres de Pérez, los señores Rivera Ortiz, Gilberto; Rodríguez García, Cancel Ríos, Ramos Barroso, Maldonado Torres, Ri-

vera Brenes, Deynes Soto, Campos Ayala, la señora Fernández, los señores Oms Carreras, Hernández Agosto y Nogueras, hijo. Autos originales, pág. 41.

Se sometió la petición a votación aprobándose la misma por votación de 14 a favor y 13 en contra.

La presidencia procedió a nombrar la Comisión Especial creada en virtud de dicha petición, recayendo su composición en los señores Senadores Rodríguez García, Calero Juarbe, Ramos, Hernández Agosto, y Cancel Ríos, de los cuales los tres primeros pertenecen al Partido Nuevo Progresista y los dos últimos al Partido Popular Democrático. Autos originales, pág. 42.

Se aprobó entonces la moción citada precedentemente del Sr. Nogueras para suspender el reconocimiento de la condición de Senador al Sr. Santa hasta tanto el Senado resolviere definitivamente la petición presentada por el Sr. Nogueras.

En la petición de interdicto, según hemos visto, la parte apelante no cuestiona la facultad constitucional del Senado para efectuar un recuento de los votos obtenidos por los señores Santa y Estrada para el escaño de Senador por el Distrito de Humacao. Lo que cuestiona es la validez de la suspensión del Sr. Santa de su cargo mientras se lleva a cabo el escrutinio de los votos por el Senado. Su fundamento es que una vez en posesión y en el ejercicio de las funciones del cargo de Senador el Sr. Santa solamente podía ser expulsado por las mismas causas que se señalan para autorizar juicios de residencia en la Sec. 21 del Art. III de la Constitución.

El tribunal de instancia, en 17 de enero de 1977, sin oír a la parte demandada dictó una orden, en auxilio de su jurisdicción, en la que mantuvo la custodia del material electoral en manos del Tribunal Electoral hasta tanto tuviere oportunidad de decidir la controversia ante su consideración. [3]

_____

[3] El tribunal de instancia luego aclaró en una vista posterior que dicha orden no constituía una orden de entredicho provisional sino una Orden para Mostrar Causa y de Señalamiento. Autos originales, pág. 120.

Dicha orden fue dejada sin efecto el próximo día al comparecer la parte demandada y exponer sus fundamentos con respecto a una moción oral de desestimación en la que planteaba la falta de jurisdicción del tribunal para entender en la controversia.

Al resolver finalmente la controversia el tribunal de instancia concluyó lo siguiente:

1. Expresó que no procedía la petición de interdicto en cuanto a los miembros del Senado, amparado en la Sec. 14 del Art. III de la Constitución, y en lo resuelto en *Powell* v. *McCormack*, 395 U.S. 486, 505–508, que concede inmunidad parlamentaria a los miembros de la Asamblea Legislativa por sus votos y expresiones en una u otra cámara o en cualquiera de sus comisiones. Dejó subsistente, sin embargo, la acción contra el Macero y el Secretario de la Cámara por no gozar éstos de la misma inmunidad. (4)

2. Expresó que la controversia es justiciable (5) por alegarse violaciones de derechos constitucionales sobre las que los tribunales son los árbitros finales.

3. Declaró que los tribunales no están impedidos de intervenir en un caso similar en que la prueba demuestre que la actuación de la cámara legislativa en cuestión fuese arbitraria o ilegal. (6)

4. Resolvió que el Senado es el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escru-

---

(4) No obstante, el pronunciamiento quedó sin efecto al desestimar la petición de *Injunction*.

(5) En esta opinión disidente llegamos a un resultado contrario por entender que la controversia es una cuestión política no justiciable. No debe confundirse el concepto de justiciabilidad con el de jurisdicción. Puede asumirse jurisdicción para determinar si la cuestión es justiciable.

(6) Los demandantes sometieron el caso a base de las alegaciones. No sometieron prueba adicional a las Actas del Senado. Aceptaron además en la vista que de tratarse de una exclusión es suficiente con un voto mayoritario. El tribunal, por tanto, no tenía base para concluir que la suspensión temporal fuera arbitraria. Autos originales, pág. 137.

tinio de su elección y que en ejercicio de dicha facultad puede suspender temporalmente a uno de sus miembros mientras se hace el recuento de los votos. El tribunal distinguió este caso del de *Powell*, supra.

En vista de la conclusión a que llegó el tribunal de instancia de que el Senado en el ejercicio de su poder de único juez tiene además la facultad de suspender al Sr. Santa, sin que se hubiese demostrado a su juicio arbitrariedad alguna en la actuación del Senado, procedió a desestimar la petición de interdicto de los demandantes.

No estando conforme los demandantes con la sentencia dictada por el tribunal de instancia instaron un recurso de apelación ante nos en el que apuntan varios errores basados sustancialmente en la interpretación que el tribunal de instancia dio a las disposiciones constitucionales y estatutarias invocadas por los demandantes, y especialmente del pronunciamiento que reconoció al Senado la facultad de excluir al Sr. Santa como miembro del Senado hasta que se efectúe el recuento de los votos.

En una moción en auxilio de la jurisdicción apelativa de este Tribunal, Mc-77-3, los apelantes solicitaron las siguientes medidas provisionales:

1. Orden dirigida a los señores Jueces del Tribunal Electoral para que mantengan bajo su jurisdicción y custodia todos los materiales electorales del Distrito Senatorial de Humacao hasta tanto este Tribunal dispusiere del recurso de apelación, y

2. Orden dirigida a los oficiales del Senado de Puerto Rico para que le reconozcan los derechos y prerrogativas al Senador Jesús Santa Aponte en su totalidad, y que cesen y desistan de realizar actuaciones que le impidan dichos derechos y prerrogativas al Senador Santa.

Sin haber dado oportunidad a la parte demandada para expresar su posición con respecto a los planteamientos que nos hicieron los apelantes para sostener su derecho a las medidas

provisionales solicitadas este Tribunal dictó una resolución ([7]) que ordenaba lo siguiente:

1. Las papeletas y todo otro material relativo a este caso se mantendrán bajo la custodia conjunta de la Comisión Especial de Escrutinio designada por el Senado y del Tribunal Electoral.

2. Como medida provisional y sin que ello en modo alguno prejuzgue la sentencia que este Tribunal resuelva emitir en este pleito y toda vez que no existen contra el apelante cargos por delito o inmoralidad, ni se alega fraude o irregularidad en su elección, la cual está favorecida por una presunción de regularidad como la de todos los demás legisladores, y en protección del derecho de los electores del Distrito Senatorial de Humacao a tener plena representación en el Senado, deberá darse asiento en el Senado al recurrente Jesús Santa Aponte.

Simultáneamente este Tribunal señaló una vista para la argumentación del recurso. Durante el transcurso de la vista la representación legal de los apelantes sostuvo que el Senado perdió jurisdicción para suspender al Senador Santa Aponte por haber sido éste juramentado y tomado posesión de su cargo.

En la opinión emitida en el día de hoy, este Tribunal, luego de haber hecho un recuento histórico del alcance de la Sec. 9 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico expresa que "[I]mpugnada la elección de un miembro de las Cámaras, el cuerpo legislativo correspondiente goza de poder constitucional exclusivo para decidir si ordena un recuento de los votos. La Constitución le faculta para ser 'el único juez de la . . . validez y del escrutinio de su elección', y la decisión de si conviene hacer un recuento es parte indispensable de dicha facultad. *Reed* v. *County Commissioners*, 277 U.S. 376, 388 (1927)." Concurro con dicha expresión.

También concurro con la expresión de que este Tribunal es el intérprete final de la Constitución y que por tanto la

---

([7]) Dicha resolución quedó sin efecto al dictarse hoy la sentencia del Tribunal que adjudica los derechos de las partes.

definición de los contornos de las facultades constitucionales de los poderes Legislativo o Ejecutivo y la determinación de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales. Esto es, la función primaria del Tribunal Supremo es la de asegurarse que las otras ramas del gobierno observen las limitaciones constitucionales.

No estoy conforme, sin embargo, con la conclusión a que llega el Tribunal en el sentido de que la controversia planteada es justiciable, ni con la determinación de que el Senado no tiene facultad para excluir temporalmente al Sr. Santa como miembro de ese cuerpo hasta tanto se efectúe el recuento de los votos.

El concepto de "cuestión política" ha sido utilizado para diferenciar cuestiones que esencialmente son para ser decididas por una de las ramas políticas de aquellas que esencialmente son para ser adjudicadas por la rama judicial. En algunas áreas la cuestión política es de fácil identificación. El Tribunal Supremo de los Estados Unidos tuvo la oportunidad de pronunciarse sobre el aspecto de justiciabilidad en el caso de *Baker* v. *Carr*, 369 U.S. 186 (1961). Catalogó la cuestión "política" primordialmente como una función de la separación de poderes, cuya determinación como cuestión "política" exige un examen cuidadoso conforme las circunstancias presentes en cada caso. *Id.* pág. 210. Allí se dijo que existen ciertos factores que salen prominentemente a la superficie en los casos en que está presente una cuestión "política". Entre los factores determinantes de una cuestión "política", señalada en *Baker*, están los siguientes que considero aplicables al caso de autos: (1) cuando aparece una facultad constitucional textualmente conferida ("a textually demonstrable constitutional commitment") a una rama de gobierno de igual jerarquía, y (2) cuando a una corte le es imposible adoptar una resolución independiente sin expresar una falta del debido respeto a una de las ramas de gobierno de igual rango. *Id.* pág. 217. La presencia de cualquiera de esos fac-

tores puede ser un impedimento para que la causa sea justiciable.

Se reconoce, sin embargo, que un tribunal no puede rechazar un pleito que plantee una controversia de buena fe en que la cuestión denominada "política" constituya una actuación en exceso de la facultad constitucional. En otras palabras, de existir una disposición constitucional que deja al juicio o dictamen de otra de las ramas de gobierno la resolución de una cosa, la Corte debe abstenerse de entender en el asunto, a menos que se alegue y demuestre que la rama actora está actuando en violación de la Constitución. Pero tal decisión recae sobre las cortes, y así lo expone *Baker:*

> "El decidir si un asunto ha sido en alguna medida consagrado en la Constitución a otra rama de gobierno, o si la actuación de dicha rama excede la facultad que ha sido así consignada, es de por sí un delicado ejercicio en interpretación constitucional, y es la responsabilidad de esta Corte como último árbitro de la Constitución." *Id.* pág. 211.

En *Powell* v. *McCormack*, 395 U.S. 486 (1969), el Tribunal Supremo nacional se volvió a enfrentar a la cuestión de justiciabilidad y reafirmó la teoría de justiciabilidad expuesta en *Baker*, pero resolvió que en las circunstancias particulares del caso de *Powell* el Congreso se había excedido de la "facultad constitucional textualmente conferida." Paso a relatar la situación de dicho caso. Powell había sido excluido de tomar posesión de su escaño Congresional por razón de ciertas actuaciones realizadas durante la sesión anterior que ponían en tela de juicio su conducta, lo que alegadamente autorizaba a la Cámara de Representantes a excluirlo como miembro bajo lo dispuesto en la Sec. 5 del Art. I de la Constitución de los Estados Unidos. En ese caso el Tribunal Supremo se preguntó si existía una "facultad constitucional textualmente conferida" a la Cámara de Representantes que excluyera la situación de hechos allí presentes *de lo que constituía una cuestión "política"*. Y concluyó diciendo que la

"facultad constitucional textualmente conferida" solamente faculta a la Cámara de Representantes a enjuiciar las calificaciones de sus miembros que expresamente aparecen enumeradas en la Sec. 5 del Art. I de la Constitución, por lo que el concepto de "facultad constitucional textualmente conferida" no constituía impedimento para adjudicar los derechos de los peticionarios.

En *Powell* no estaba en cuestión la validez de las actas ni el escrutinio de su elección, sino un requisito de buena conducta exigídole, que resultaba ser adicional a los que se especifican en la Constitución. Los propios demandados concedían que Powell reunía los requisitos constitucionales. *Id.* pág. 551.

La verdadera cuestión constitucional a la que se enfrentaba el Tribunal en *Powell* era la de si el Congreso tenía el poder para desviarse de o modificar las calificaciones constitucionales de un miembro de la Cámara de Representantes. Por haber añadido la Cámara una calificación adicional a las enumeradas en la Constitución el Tribunal entendió que la Cámara no podía ser el único juez de una calificación que no era de las mencionadas en la Constitución. La determinación de los derechos de Powell al escaño sólo requería una interpretación constitucional, cuya función cae bajo el rol tradicional reservado a las cortes para interpretar la ley, y no envuelve, por ende, una determinación inicial de una cuestión "política" de las reservadas a la discreción no judicial. *Id.* págs. 548–49; véase *Baker* v. *Carr*, supra, pág. 217.

En el caso de autos, la opinión emitida no ha analizado los conceptos expuestos en *Baker* y en *Powell* para determinar si se plantea una cuestión "política" de la cual debe abstenerse de considerar. No tengo duda de que existe en nuestra Constitución una "facultad constitucional textualmente conferida" a las cámaras legislativas que las faculta como únicos jueces de la validez de las actas y del escrutinio de la elección de sus miembros. Y, a menos que se demuestre arbitrariedad

en los procedimientos relativos al escrutinio, incluyendo las medidas que el Senado tome en auxilio de su jurisdicción([8]) como único juez en protección de los 200,000 electores que emitieron su voto y de los dos candidatos que se disputan la elección, este Tribunal no debe intervenir. El Tribunal Supremo de los Estados Unidos ha resuelto que el Senado es el juez de las decisiones, resultados y calificaciones de sus miembros y que está completamente autorizado para determinar dichas cuestiones sin la ayuda de la Cámara de Representantes ni de la rama ejecutiva ni judicial. Añade que ese poder conlleva la autoridad para tomar todos aquellos pasos que sean necesarios para obtener la información que sea requerida para decidir las elecciones en cuestión. *Reed* v. *County Commissioners*, supra, pág. 388, citado en *Roudebush* v. *Hartke*, 405 U.S. 15 (1922), pág. 31. La intervención judicial con dicho poder indubitable es solamente posible si se demostrare claramente el "uso arbitrario o desconsiderado de poder que constituya una negación del debido procedimiento de ley."([9]) *Barry* v. *Cunningham*, 279 U.S. 597 (1928), pág. 620.

Dirigiéndose a una alegación de los electores de Powell en el sentido de que su exclusión de la Cámara de Representantes violaba los importantes derechos constitucionales del sufragio y de estar representados por quien fue electo en el proceso electoral, el Juez Warren Burger hizo unas expresiones significativas siendo aún juez de la Corte de Circuito

---

([8]) La Constitución de Puerto Rico dispone que: "Cada cámara . . . adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno." Art. III, Sec. 9.

([9]) En ocasiones en que se han invocado las cláusulas de debido procedimiento de ley y la igual protección de las leyes para convencer al tribunal de la justiciabilidad de una cuestión "política" el Tribunal Supremo de los Estados Unidos, al rechazar los reclamos bajo dichas cláusulas como no justiciables, ha dicho que las mismas fueron invocadas meramente como auxilio verbal para la resolución de causas que envuelven cuestiones políticas. *Pacific Telephone* v. *Oregon*, 223 U.S. 118 (1911).

de los Estados Unidos, que citamos a continuación, y con las que estamos de acuerdo.

"El derecho a votar libremente por el candidato que uno escoja va a la esencia de la sociedad democrática, y cualquier restricción de dicho derecho va al corazón del gobierno representativo." *Powell* v. *McCormack*, 395 F.2d 577 (1968); revocado por otras razones, 395 U.S. 486 (1969). *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964).

"Los derechos así protegidos, sin embargo, se refieren al derecho inicial de votar—el derecho a decir quién será el representante. No se extienden directamente al derecho a tener ese particular representante sentado en el Congreso bajo cualquier circunstancia. La propia Constitución, según hemos señalado antes, fija unos límites específicos a los derechos de los electores a tener sentado en el Congreso a la persona que ellos seleccionen: fijar requisitos de elegibilidad con respecto a edad, ciudadanía y residencia . . . ; en adición . . . el Congreso tiene poderes de exclusión y expulsión. Ciertamente estas disposiciones hacen claro que los derechos cuidadosamente protegidos a los electores de votar por quien deseen, no necesariamente conlleva un derecho concurrente de tener a esa persona sentada en el Congreso." *Powell* v. *McCormack*, 395 F.2d 577, 597 (1968).

En *United States* v. *Classic*, 313 U.S. 299 (1941), expresó el Tribunal Supremo federal que ese derecho al voto no era absoluto: "Que la libre selección del pueblo de sus representantes en el Congreso, sujeta solamente a las restricciones contenidas en las Secs. 2 y 4 del Art. I *y en otras partes de la Constitución*, era uno de los grandes objetivos de nuestro esquema constitucional que no puede dudarse." Pág. 316. (Énfasis suplido.)

Entiendo que la facultad constitucional otorgada al Senado de ser el único juez de la validez de las actas y del escrutinio de su elección constituye una protección a los electores que les asegura que el representante que finalmente ocupe un escaño en dicho cuerpo sea el que eligió el pueblo mediante el libre sufragio. Esto es, a mi juicio, la inquietud que ha demostrado el Senado al negar el escaño al Senador Santa

hasta no asegurarse debidamente de que el Senador Santa es la persona que la mayoría de los electores del Distrito de Humacao desea que les represente en ese alto cuerpo.

El otro factor de los señalados en *Baker* v. *Carr* para identificar una cuestión "política", a saber: la imposibilidad de una corte de adoptar una resolución independiente sin expresar falta del debido respeto a una de las ramas de gobierno de igual jerarquía, también está presente en el caso de autos. Ya el Senado tomó una determinación temporera de excluir al Sr. Santa de su escaño hasta que se efectúe el escrutinio de los votos emitidos en su elección. Este Tribunal no tiene elementos de juicio distintos a los que tuvo ante sí el Senado al tomar su decisión. La información que surge de las actas del Senado de 12 de enero de 1977 transcritas precedentemente convenció al Senado de que existían suficientes deficiencias en el conteo de votos que podían cambiar el resultado de la elección. Si el Senado hubiere hecho un mal juicio en la determinación de excluir al Sr. Santa, no es función de este Tribunal intervenir.(¹⁰) Se plantea una cuestión "política" que solamente debe resolver el Senado de Puerto Rico en esta etapa. En vista de lo expuesto concluyo que el caso de autos no reúne los requisitos para ser justiciable.

Resulta incomprensible que contra la facultad constitucional indubitable del Senado como único juez de la validez de las actas y escrutinio de elección, haya este Tribunal opuesto la presunción de corrección que establece la Ley de Evidencia para sostener la certificación de elección expedida por el Tribunal Electoral a favor del Sr. Santa, cuando precisamente lo que está cuestionado por el Senado es la corrección de las actas y del escrutinio. Este Tribunal, insisto, no puede poner en tela de juicio la determinación del Senado fundamentada en la información que surge de las referidas actas del Senado cuyo contenido no ha sido objetado por los peti-

---

(¹⁰) Nuestro criterio como jueces podría ser distinto al del Senado pero estamos impedidos de sustituir el nuestro por el de los Senadores.

cionarios. Tal presunción de corrección no es aplicable al Senado de Puerto Rico cuando éste decide hacer un juicio independiente del escrutinio de la elección. Los únicos impedimentos para la actuación del Senado deben ser de orden constitucional. Según hemos expresado precedentemente el Senado tiene la facultad constitucional para efectuar el recuento, y mediando la determinación de que existen motivos fundados para creer que existen errores en los cómputos eleccionarios, según queda revelado por las Actas no impugnadas del Senado del 12 de enero de 1977, el Senado adoptó la medida provisional de exclusión. Reitero que no podemos intervenir con su discreción.

Me causa, además, sorpresa la determinación del Tribunal al dejar sin efecto una actuación del Senado de Puerto Rico, sin existir precedente judicial alguno en la jurisprudencia de los Estados Unidos ni en la de Puerto Rico, de que una corte haya compelido a una cámara legislativa a reintegrar a su cargo a un legislador que ha sido excluido por estar impugnado el escrutinio de su elección. Tradicionalmente se ha reconocido el poder conferido por la Constitución a las Cámaras legislativas para excluir o suspender temporalmente a un legislador mientras se aclara la impugnación sobre su elección. El único caso que podría asemejarse al de autos es el ya discutido caso de *Powell* en el que según analizáramos en el curso de esta opinión se trataba de la imposición de una calificación que no es requerida por la Constitución. El Tribunal Supremo federal expresó allí, en una sentencia declaratoria, luego de convertido el caso en académico, ([11]) que la Cámara se había excedido al exigir a uno de sus miembros una calificación que no era de las enumeradas en la Constitución. Precisamente, la doctrina de abstención judicial en los casos en que está envuelto el balance entre los poderes gubernamentales aconsejan la prudencia en los tribunales en

---

([11]) Al resolverse el caso de *Powell* ya éste había sido elegido nuevamente en una elección subsiguiente.

una situación que nunca se ha resuelto judicialmente y que sus consecuencias en el caso planteado no alcanzan proporciones alarmantes que amenacen los trabajos legislativos ni el sistema democrático de gobierno. ([12])

¿Es que las determinaciones que sostienen la actuación del Senado al impugnar el escrutinio de los votos depositados en la elección de los candidatos a Senador por el Distrito de Humacao, a la luz de los hechos aducidos en la petición de impugnación presentada, discutida en debate y aprobada por la mayoría del Senado sin estar controvertida dicha petición por los peticionarios, goza de menor jerarquía que la presunción de corrección que este Tribunal reconoce a las determinaciones de hechos de los tribunales de instancia?

Tratándose este caso de una petición de interdicto, ¿debe un tribunal dictar la orden solicitada sin concluir que la parte peticionaria tiene una posibilidad real de prevalecer en los méritos de su petición, que no es otra cosa que la seguridad de salir victoriosa en el escrutinio de votos que se efectúe?

¿No debe merecerle deferencia la determinación hecha por una rama de gobierno de igual jerarquía con respecto a las posibilidades de que la parte peticionaria no pueda prevalecer?

¿No es precisamente ésta una situación en la que se encuentra presente una "facultad constitucional textualmente conferida" (*Baker* v. *Carr*, supra) en que entra en juego el "delicado ejercicio en interpretación judicial" y en el cual este Tribunal debe ejercer su auto limitación tradicional,

---

([12]) En *Bond* v. *Floyd*, 385 U.S. 116 (1966), se resolvió que un legislador estatal había sido excluido por unas manifestaciones políticas contra la guerra de Vietnam y que su exclusión violaba la Primera Enmienda de la Constitución de los Estados Unidos. Aunque el Senado sostenía que dichas expresiones eran conflictivas con la prestación del juramento de fidelidad que exige la Constitución Federal, el Tribunal resolvió que estaban protegidas por el derecho constitucional de libre expresión. Al resolverse el caso ya el legislador había sido electo nuevamente al cargo en una elección especial.

especialmente tratándose de una cuestión sobre la que la Constitución ha concedido la autoridad a una rama de gobierno, y sobre la cual las cortes nunca se han pronunciado?

¿No debe reconocerse al Senado el poder incidental de excluir o suspender temporalmente de su seno, ante el mandato constitucional indubitable de "único juez", mientras se hace el recuento de votos, en las circunstancias presentes en este caso que revelan de su faz unas discrepancias que deben aclararse para beneficio de los dos candidatos que se disputan la elección, así como de los 200,000 electores que votaron por uno u otro, quienes tienen derechos válidos que deben ser protegidos hasta tanto se haya hecho una determinación final sobre el resultado de la elección?

Los derechos constitucionales no deben ser creados bajo la cláusula de debido proceso de ley a menos que puedan ser declarados mediante principios suficientemente absolutos que echen raíces en la comunidad con garantía de continuidad por períodos sustanciales de tiempo, y sean elevados por encima del nivel de juicios pragmáticos de un lugar y momento en particular. Véase Cox, *The Role of the Supreme Court in American Government*, pág. 114 (1976).

No puedo dejar de expresar mi preocupación de que en situaciones como la que se plantea en el caso de autos las cámaras legislativas en el ejercicio de las facultades que la Constitución le confieren como únicos jueces de la validez de las actas y de los escrutinios, adopten y observen todos los criterios constitucionales que protejan a las partes envueltas. Sus actuaciones, independientemente de la facultad con que se ejercen, están sujetas al escrutinio del pueblo lo que indudablemente constituye un freno en sus prerrogativas. Es de esperarse que las garantías procesales y sustantivas sean incorporadas en los procedimientos, evitándose así que puedan resultar en abusos o arbitrariedades. La integridad en la búsqueda de los hechos debe mantenerse por encima de toda otra consideración. Este Tribunal, en última instancia,

podría intervenir en protección de los derechos constitucionales fundamentales de las partes si los mismos fueren violados. Este no es el caso que se plantea ante este Tribunal.

En vista de que la controversia planteada por los peticionarios-apelantes constituye una cuestión "política" no justiciable declararía sin lugar el recurso de apelación interpuesto por los peticionarios.