Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| SUNNOVA ENERGY CORPORATION<br><br>Apelado<br><br>v.<br><br>LINDA BÁEZ FERNÁNDEZ<br><br>Apelante | KLAN202400618 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso Núm.: PO2023CV03295 (606)<br><br>Sobre: Cobro de Dinero |
| --- | --- | --- |

Panel integrado por su presidenta, la Juez Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de agosto de 2024.

Comparece ante nos Linda Báez Fernández ("señora Báez" o "Apelante") mediante una *Apelación* presentada el 24 de junio de 2024. Nos solicita que revoquemos la *Sentencia* dictada el 17 de mayo de 2024 y notificada el 23 de mayo del mismo año por el Tribunal de Primera Instancia, Sala Superior de Ponce ("foro primario" o "foro *a quo*"). Por virtud de esta, el foro primario declaró *Ha Lugar* la *Demanda* sobre cobro de dinero incoada por Sunnova Energy Corporation ("Sunnova" o "Apelada"). En consecuencia, el foro *a quo* condenó a la Apelante al pago de una deuda ascendiente a $2,983.07, por haber dejado de pagar unas mensualidades conforme a un contrato suscrito entre las partes de epígrafe.

Por los fundamentos que expondremos a continuación, **confirmamos** la sentencia apelada.

Número Identificador

SEN(RES)2024_____

**I.**

La génesis de este caso se remonta al 3 de noviembre de 2023 cuando Sunnova presentó una *Demanda en Cobro de Dinero al Amparo de la Regla 60 de Procedimiento Civil* contra la señora Báez.[1] Mediante esta, alegó que el 13 de mayo de 2019, la Apelante suscribió un contrato de venta a plazos con la Apelada para la compra de un sistema fotovoltaico y un sistema de almacenamiento de energía. Esbozó que, conforme al referido contrato, la señora Báez tenía la obligación de emitir pagos mensuales. No obstante, indicó que la Apelante dejó de pagar dichas mensualidades, por lo cual, se generó una deuda de $2,983.07. Arguyó que, en varias instancias, intentó cobrar lo adeudado pero dichas gestiones fueron infructuosas. Por ello, sostuvo que la deuda era líquida vencida y exigible, por ello, solicitó que se dictara sentencia a su favor y ordenara a la señora Baez a pagar la suma adeudada.

En respuesta, el 7 de diciembre de 2023, la Apelante presentó su *Contestación a Demanda*.[2] Mediante esta, negó algunas alegaciones y levantó varias defensas afirmativas, entre las cuales incluyó como defensa que en el caso de marras no hubo contrato entre las partes. Posteriormente, el 12 de diciembre de 2023, la Apelante presentó una *Urgente solicitud de Conversión de Trámite Procesal de uno Sumario a uno Ordinario & Solicitud para la Imposición de una Fianza de no residente*.[3] En esencia, enfatizó que en este caso nunca se firmó un contrato, sino que más bien hubo vicio en el consentimiento, ya que aparentemente alguien firmó por la señora Báez. Puntualizó que, por este motivo, se requería activar mecanismos de descubrimiento de prueba. De otro lado, expresó

---

[1] Véase el Apéndice de la Apelante, pág.1-2.
[2] *Íd.*, págs. 7-9.
[3] *Íd.*, págs. 10-11.

que Sunnova debía pagar fianza de no residente conforme lo exige nuestro ordenamiento jurídico.

Examinado este escrito el 12 de diciembre de 2023, el foro primario le concedió diez (10) días a Sunnova para que presentara su postura.[4] Así pues, el 17 de enero de 2024, la Apelada presentó *Moción en Cumplimiento de Orden.*[5] En lo pertinente, reiteró que las partes habían suscrito un contrato mediante el cual la señora Báez se comprometió a instalar un equipo valorado en $28,512.50. A su vez, se comprometió a realizar un pago inicial de $1,000.00, además de cumplir con una mensualidad de $177.10 por un término de 25 años. En virtud de ello, resaltó que la Apelante no había presentado argumentos sustanciales que justificaran la conversión del presente pleito a uno ordinario. Cónsono con lo antes expuesto, ese mismo día, el foro primario declaró *No Ha Lugar* la conversión del proceso.[6]

Surge del expediente que, subsiguientemente, el 11 y 25 de abril de 2024 se celebró la vista en su fondo. Culminado el juicio, el foro primario emitió *Sentencia* el 17 de mayo de 2024, la cual fue notificada el 23 de mayo del mismo año.[7] De esta se desprende que las partes presentaron la siguiente prueba:

**Prueba de la Parte Demandante:** [Sunnova]

Exhibit 1 -Carta de Cobro
Exhibit 2 -Contrato
Exhibit 3 -Certificado de Firma y Envío
Exhibit 4 -Desglose de la Deuda

**Prueba de la Parte Demandada:** [señora Baez]

Exhibit A -Notificación de Contrato
Exhibit B -Cadena de Correos Electrónicos (6 págs.)
Exhibit C -Requerimientos de Admisiones
Exhibit D -Contestación a Requerimientos de Admisiones
Exhibit E -Detalle sobre la ubicación del IP Address 66.87.196.156.
Exhibit F -Detalle sobre la ubicación del IP Address 184.212.210.122.[8]

---

[4] *Íd.*, pág. 12.
[5] *Íd.*, págs. 13-15.
[6] *Íd.*, pág. 18.
[7] *Íd.*, págs. 249-266.
[8] *Íd.*, pág. 252.

Asimismo, mediante este dictamen, el foro primario formuló unas determinaciones de hechos, las cuales se transcriben a continuación:

1. La Sra. **María Mota Salcedo** es la Gerente de Cobros de Sunnova Energy. La Sra. Mota tiene entre sus funciones entrenar a los agentes a entender el sistema de softwares, ayudar a los clientes con sus problemas, abrir casos, que se refiere a si hay algún problema con otro departamento, se debe abrir un caso, documentar que sucedió y como se solucionó o no el problema. La Sra. Mota Salcedo es la custodia de los récords de cobro de Sunnova.

2. La parte demandante Sunnova cuenta con una plataforma llamada **Salesforce** donde se almacena información sobre las transacciones con los clientes. La Sra. Mota Salcedo explicó que en dicha plataforma se mantiene la llamada de validación que se hace con el cliente, donde se confirma con el cliente la información básica, como el nombre, dirección, correo electrónico, si vive en el hogar, si entiende lo que ha firmado, se le explica lo que firma y sus pagos mensuales. Todos los agentes de Sunnova tienen acceso a esa plataforma vía una contraseña y el correo electrónico de la compañía. La Sra. Mota Salcedo trabaja todos los días con esa plataforma y afirma que es información confiable. En esa plataforma también se mantienen las llamadas de confirmación, las llamadas hechas y recibidas del cliente, correos electrónicos enviados y recibidos del cliente, métodos de pago que brinda el cliente o que obtienen del cliente, pagos realizados y los casos que generan.

3. La parte demandante Sunnova utiliza la plataforma **Docusign** para que los clientes puedan firmar su contrato. El cliente accede a su correo electrónico para abrir el correo electrónico que le envía **Docusign** para que pueda firmar el contrato. La firma es un método electrónico donde el cliente puede seleccionar la manera en la que va a firmar, puede ser con el dedo o escogiendo la firma, tras seleccionar el tipo de letra (*font*), el sistema usa ese tipo de letra y el nombre del cliente para auto programar una firma del cliente. Si el cliente escoge no usar ese método, lo hace con el teléfono o una tableta pueden firmar con su dedo. Esa plataforma **Docusign** se utiliza a diario en Sunnova. La parte demandante no utiliza otro método de firma para sus contratos, no se firma ningún contrato a mano.

4. La Sra. Mota Salcedo conoce a la demandada porque fue una cliente que tuvieron que llamar para intentar cobrar el balance adeudado.

5. El contrato con la demandada, el sistema se puso oficialmente en servicio desde el mes de junio de 2019, pero las gestiones fueron antes de esa fecha.

6. La Sra. Mota Salcedo explicó que en Puerto Rico Sunnova tiene distintos tipos de contratos de compra de producción que se conocen como "PPA", "*PPA's easy*", "*loans storages*" y "*lease storages*". El "*loan storage*" es un almacenamiento de préstamos, el "*easy*" es que el producto tendría un rédito fijo y el PPA es la venta de producción que tiene sus pagos variados. En este caso se usó el almacenamiento de préstamo "*loan storage*" donde se está comprando el sistema que incluye una batería y se financia el sistema para pagarlo.

7.  El contrato de la demandada Linda Báez Fernández es un **SunSafe EasyOwn**. La Sra. Mota Salcedo aclaró que el término "loan storage" es el que usan internamente para referirse a ese tipo de contrato de financiamiento del sistema con la batería. En este caso, los contratantes son la demandada y los instaladores que en este caso fue *Integrated Solar Operation* (ISO). El documento fue firmado a través de la plataforma **Docusign** el 13 de mayo de 2019.

8.  El contrato objeto del presente caso fue otorgado el 13 de mayo de 2019 y las partes contratantes lo firmaron a través de la plataforma de **Docusign**. El contrato se le hizo llegar a la parte demandada por un correo electrónico generado por la plataforma **Docusign** a la dirección renetorresponce@hotmail.com, la cual pertenece al esposo de la demandada, el señor René Torres Maldonado, y según fue solicitado por la parte demandada.

9.  De acuerdo con la confirmación generada por la plataforma de **Docusign**, el contrato fue enviado por correo electrónico a la demandada el 13 de mayo de 2019 a las 4:09:58 pm, fue visto por ésta a las 4:11:23 pm y firmado a las 4:21:08 pm. El representante de ISO, el señor Ralph Díaz, recibió el Contrato ya firmado por la demandada el mismo 13 de mayo de 2019 a las 4:21:10 pm, lo vio a las 4:37:02 pm y lo firmó a las 4:37:24 pm. A las 4:37:24 pm se completó todo el proceso de firmar el contrato.

10. La compañía que realizó el diseño e instalación del sistema de la demandada fue Integrated Solar Operation o ISO Group. La parte demandante no participó del proceso de venta de este servicio, sino que actuó como el ente que financió la compra.

11. En el contrato, la parte demandante se obligó a mantener el sistema después de la instalación y a empezar a cobrar y obtener pagos. En este caso, los pagos acordados fueron por la suma de $177.10 mensuales por 25 años. El costo total financiado del contrato fue de $57,128.58.

12. La parte demandada realizó un total de siete (7) pagos por la cantidad de $176.63, comenzando con un primer pago en agosto de 2019 y el último pago realizado fue en febrero de 2020.

13. La Sra. Mota Salcedo declaró que obtuvo la información para el desglose de los pagos y la deuda de la plataforma *Salesforce*. Después de febrero de 2020 la demandada no realizó pagos adicionales.

14. La Sra. Mota Salcedo declaró se hicieron llamadas a la demandada para entender el motivo por el cual no quería hacer los pagos y trata de llegar a un acuerdo para que continuara con el contrato. Estas gestiones comenzaron desde el mes de abril de 2020. La Sra. Mota Salcedo explicó que intentaron obtener un pago en abril de 2020, le dieron una oportunidad para que contestaran las llamadas y hacer un pago, tuvo un periodo de tiempo para desconectarse del sistema, por lo que continuaron facturándole, luego se hizo un *write-off*, lo cual explicó que se refiere a dejar de cobrar, pausando el contrato.

15. La deuda acumulada por la parte demandada reclamada en la Demanda asciende a la cantidad de **$2,983.07**, que comprende el periodo de marzo de 2020 hasta mayo 2021.

16. La Sra. Mota Salcedo declaró que lo último que supieron fue que la demandada quería remover el sistema que fue instalado en su residencia, pero desconoce si lo removieron o no. Actualmente, el sistema no está funcionando porque se desconectó debido a que la demandada no realizó los pagos a la cuenta.

17. El 1 de septiembre de 2020 Sunnova le envió una carta de cobro a la demandada, informando el balance adeudado a esa fecha por la cantidad de $1,379.39.

18. La Sra. Mota Salcedo declaró que la parte demandante envió dos (2) cartas; primero una carta de desconexión "*disconnect letter*" notificando que si no paga el monto adeudado se le va a desconectar el sistema; y luego una segunda, una carta sobre incumplimiento "*default letter*" donde se le informa que para poder continuar con el contrato tiene que hacer un arreglo de pago o pagar el contrato en su totalidad. Al momento de hacer la reclamación, revisaron si se habían enviado estas dos (2) cartas a la parte demandada para que tuviera notificación de que no estaba haciendo sus pagos, el balance pendiente; y confirmar que hicieron todo lo necesario para intentar hablar y llegar a un entendimiento o resolución a los problemas, obtener un pago y no tener que presentar la Demanda.

19. La Sra. Mota Salcedo reconoció que Sunnova preparó el contrato y que la participación de la parte demandada en el mismo se limitó a su firma.

20. A la fecha en que se firmó el contrato en este caso, 13 de mayo de 2019, no había ningún sistema instalado en la residencia de la demandada; la instalación fue posterior a la firma y la parte demandante comenzó a cobrar una vez está instalado el sistema.

21. El contrato contiene una cláusula que permite al cliente su cancelación siete (7) días después de su firma, sin que se le realice cobro alguno. En este caso, la instalación del sistema ocurrió mucho después de los siete (7) días de haberse suscrito el contrato. La Sra. Mota Salcedo respondió que el cliente puede cancelar el sistema después de esos siete (7) días hasta la fecha en que el sistema se instale, pero debe pagar unos costos por las gestiones que se hacen a la fecha en que se instaló el sistema.

22. En este caso, la Sra. Mota Salcedo reconoció que la demandada hizo la gestión para cancelar el contrato después del periodo de siete (7) días. No se estableció la fecha, ni la forma específica en que se hizo tal gestión.

23. El contrato tiene la siguiente advertencia:

"USTED TIENE DERECHO A UNA COPIA DEBIDAMENTE CUMPLIMENTADA DE ESTE ACUERDO, FIRMADO TANTO POR USTED COMO POR EL CONTRATISTA, ANTES DE COMENZAR CUALQUIER TRABAJO".

24. La Sra. Mota Salcedo declaró que el contratista no es quien le da el contrato a la parte demandada, esta lo recibe de la plataforma de **Docusign**. El contratista no tiene acceso para enviar el contrato.

25. En la página 13 del contrato se incluyó el Anejo 1 el cual establece:

"AVISO DE CANCELACION LA LEY REQUIERE QUE, ANTES DE QUE UN CONTRATISTA FIRME UN ACUERDO CON USTED SOBRE UNA OBRA DE MEJORA EN SU PROPIEDAD, EL CONTRATISTA LE

DEBERÁ OFRECER UNA COPIA DE ESTE AVISO DE CANCELACIÓN CON RESPECTO A SU DERECHO A CANCELAR ESTE ACUERDO DE MEJORAS PARA EL HOGAR. Este Aviso de Cancelación se adjunta al presente Acuerdo de Mejoras para el Hogar y se hace formar parte del mismo".

26. El Anejo 1 es el propio Aviso de Cancelación y se hace formar parte del contrato y se le notificó a la demandada junto con el mismo.

27. El contratista, es quien instala el sistema fotovoltaico y la batería. En el contrato el contratista está representado por el Sr. Ralph Díaz Ramos. La Sra. Mota Salcedo declaró que al Sr. Ralph Díaz se le envió el contrato después de que la demandada lo firmó, por tanto, él lo firmó después de la demandada.

28. La certificación que genera **Docusign** tiene el IP Address de dónde estaba la demandada al momento en que lo firma.

29. La Sra. Mota Salcedo afirmó que después de que el Sr. Ralph Díaz firmó el contrato se le envió copia a la demandada y que en la certificación13 que genera **Docusign** donde dice *signing complete* corresponde a la fecha y hora en que se envió el Contrato firmado por todas las partes y que ambos debieron recibir el Contrato con las firmas.

30. El último párrafo del inciso 5 de los términos y condiciones de la venta en el contrato, establece:

    "Si usted o el Contratista terminan o cancelan este Acuerdo de Mejoras para el Hogar antes de la Fecha de Interconexión o 30 días después de que la instalación del Sistema sea completada, si ésta fecha es anterior a la Fecha de Interconexión, el Contrato de Venta al Por Menor a Plazos, así como el Contrato de Garantía se darán por terminado. Si usted o el Acreedor o el Contratista terminan el Contrato de Venta al Por Menor a Plazos o el Contrato de Garantía, respectivamente, antes de la Fecha de Interconexión, este Acuerdo de Mejoras para el Hogar también se dará por terminado".

31. La demandada se comunicó en enero de 2020 para cancelar el contrato. La Sra. Mota Salcedo no tiene el día específico, ya que no lo verificó en la plataforma de **Salesforce** previo a declarar en el Juicio.

32. La demandada envió varias comunicaciones a Sunnova solicitando le enviaran el contrato.

33. En la certificación generada por **Docusign** surge que el IP Address de la demandada fue el 184.212.210.122. La residencia donde se instaló el sistema ubica en Ponce, Puerto Rico.

34. La Sra. Mota Salcedo respondió al requerimiento que le cursó la parte demandada, en lo pertinente, que "*los términos son los recogidos en el contrato, no tienen conocimiento de lo acordado o discutido entre la demandada con ISO*".

35. La Sra. Mota Salcedo declaró que los funcionarios de ISO son los responsables de explicar a los clientes sobre cómo el sistema funciona y qué es lo que le pueden brindar como un sistema para su hogar.

36. La Sra. Mota Salcedo indició que el contrato le incluye la información de cuantos kilovatios va a poder brindarle el sistema, el tamaño del sistema y cuánto va a costar el

sistema, así como los pagos mensuales. Pero caso a caso, no tiene conocimiento específico de lo que ese funcionario de ISO habla con el cliente.

37. La parte demandante no instaló el equipo; solo cobra lo que se acordó en el contrato sobre los pagos mensuales del sistema que se le instaló a la demandada.

38. La Sra. Mota Salcedo declaró que luego de la firma del contrato a través de **Docusign**, se hace una llamada de validación por un funcionario de la parte demandante. En este caso se hizo una llamada a la demandada el 13 de mayo de 2019 para confirmar los detalles y explicarle los detalles de lo que acaba de firmar. La Sra. Mota Salcedo tiene acceso a esa información a través de la plataforma **Salesforce**.

39. Una vez se completa la instalación y la interconexión, Sunnova comienza a facturar al cliente. En este caso, la fecha de interconexión fue el 25 de junio de 2019.

40. La Sra. **Linda Báez Fernández**, aquí demandada, declaró que el 13 de mayo de 2019 el Sr. Miró de ISO les presentó, a ella y su esposo, un equipo en el que estaban interesados. La Sra. Báez expresó que el Sr. Miró fue con una tableta y que ella firmó en la tableta para verificar su crédito. Esta afirmó que no recibió ningún contrato de Sunnova el 13 de mayo de 2019, ya que sólo firmó en la tableta del Sr. Miró para verificar el crédito. La demandada reconoció que el servicio fue instalado en su residencia después de mayo de 2019, aunque no recuerda la fecha exacta.

41. La demandada declaró que hizo varias llamadas a ISO y a Sunnova porque, según su entender, lo que instalaron no fue lo que acordaron. La demandada sostiene que las gestiones para cancelar el contrato las realizó inmediatamente después de que le instalaron, aunque no indicó fecha específica o aproximada de tales gestiones. Esta manifestó que fue antes de que le facturaran por el servicio. La demandada declaró que hizo llamadas a ISO y a Sunnova porque ISO le dijo que llamara al número que estaba en el contrato.

42. Al ser confrontada con la firma electrónica en el contrato, la demandada manifestó que no sabe cómo llegó su nombre al mismo y que esa no es su firma. La demandada abundó que no autorizó a ningún representante de ISO o Sunnova para usar su firma o rasgos de su firma.

43. El 5 de agosto de 2019 la demandada le cursó un correo electrónico a la dirección de servicio al cliente de Sunnova desde su correo electrónico lindadoc0530@yahoo.com. La demandada anejó al correo electrónico a Sunnova capturas de pantallas "screenshots" que afirma corresponden a la producción de los paneles solares en la aplicación de Tesla. El texto del mensaje fue el siguiente:

*I have requested and I'm requesting again, my contract via mail: PO Box 10201 Ponce, PR 00732 44.*

44. La demandada testificó que envió ese mensaje porque desde mayo de 2019 no había recibido el contrato, ni por correo electrónico, ni por correo postal.

45. El 6 de agosto de 2019 el Departamento de Servicio al Cliente de Sunnova le contestó el correo electrónico dándole las gracias por contactarlos y acompañó el contrato en formato PDF.

46. Además, Sunnova le envió el contrato por correo postal con fecha del 8 de agosto de 2019.

47. La demandada declaró que realizó unos pagos porque era su deber, se lo estaban sacando de la cuenta.

48. La demandada entiende que con las gestiones que hizo para cancelar no le debe nada a Sunnova.

49. En cuanto a las direcciones de IP que se consignan en la certificación de Docusign, la demandada sostiene que esos IP Address no son de su casa en Ponce y que sabe esa información verificando el IP Address en la computadora laptop en su casa. No obstante, esta información no nos merece suficientes garantías de confiabilidad, por lo que no le adjudicamos valor probatorio.

50. En el turno de preguntas en contrainterrogatorio, la demandada reconoció que en la cadena de correos electrónicos que presentó en evidencia, no escribió para cancelar el servicio, ni escribió quejas sobre el servicio que le estaban dando.

51. Asimismo, la demandada respondió que se le verificó el crédito para financiar el equipo de placas solares que iban a instalar en su casa, que ese equipo se instaló en su casa, que se pusieron las placas y se pusieron a funcionar, que pagó en los meses de agosto, septiembre, octubre, noviembre, diciembre de 2019 y en enero y febrero de 2020. De ahí en adelante interrumpió los pagos y no hizo ningún otro pago. Hoy en día no ha realizado más ningún pago, el equipo continúa en su residencia.

52. La demandada reconoció en el contrainterrogatorio que consintió a un contrato para que se instalaran unas placas solares en su casa y se comprometió a hacer unos pagos mensuales a cambio de esa instalación que se iba a hacer en su casa.

53. Con el correo electrónico del Sr. René Torres, esposo de la demandada, se hizo el intercambio de los documentos entre Sunnova y la demandada.

54. El número de teléfono (787) 235–0943 era del Sr. René Torres. La información para proveer el número de cuenta, número de ruta, autorización de cobro directo se hizo a través de una llamada telefónica que hizo el Sr. Miró, representante de Sunnova en Texas. La demandada declaró que en esa llamada no le explicaron los detalles del contrato, ni lo que estaba firmando. La demandada declaró que no recordaba si le habían explicado los detalles de la cancelación, y si admitió que le explicaron sobre la mensualidad que se comprometió a pagar. La demandada negó que en esa llamada le hayan dicho que le iban a enviar el contrato y negó que se le haya afirmado que, si lo había recibido, le podían enviar otra copia.

55. Luego de ser confrontada con la grabación de la llamada para fines de impugnación, la demandada reconoció que sí hubo una llamada para explicar los detalles del contrato, que le dieron detalles sobre lo que se iba a instalar, que se le dijo en la llamada los términos de la cancelación en los siete (7) días y que le acababan de enviar el contrato por correo electrónico y que si quería que se le enviara otro a lo que la demandada respondió que sí que estaba bien.

56. La demandada se reiteró en que no firmó un contrato con Sunnova.

57. En el turno de preguntas en redirecto, la demandada respondió que en la llamada de validación no se habló del proceso de cancelación de treinta (30) días, que el representante que atendió la llamada le dijo que le iba a

enviar el contrato, pero lo vino a recibir el 5 de agosto después de las gestiones que ella realizó.

58. El Sr. René Torres Maldonado es el esposo de la demandada. Su dirección de correo electrónico es: renetorresponce@hotmail.com. El Sr. Torres declaró que el 13 de mayo de 2019 no recibió el contrato por correo electrónico, ni posterior a esa fecha. Ese día 13 de mayo de 2019 estaba en su casa y fue una persona a hacerle una explicación sobre las placas solares "el aquel para las placas solares" y estuvieron de acuerdo en hablar con él y llegar a unos acuerdos. Lo que se firmó fue para autorizar para verificar el crédito y que no se firmó ningún contrato, ni se le entregó nada.[9]

A base de estas determinaciones de hechos, el foro primario concluyó que las partes suscribieron un contrato denominado *SunSafe Essy Own* mediante el cual la señora Báez se obligó a financiar un sistema solar fotovoltaico. Detalló que, que la Apelante emitió siete (7) pagos mensuales y a partir de marzo de 2020, dejó de pagarle mensualmente a Sunnova, lo cual hasta mayo de 2021, generó una deuda de $2,983.07. Además el foro primario determinó que fue en esa fecha, entiéndase, en mayo de 2021, que la Apelada efectuó la cancelación del contrato por lo cual dejó de cobrar las mensualidades. Además, determinó que, conforme a la prueba presentada en el juicio, se realizaron distintas gestiones para recobrar la acreencia que la señora Báez le debía a Sunnova, pero estas gestiones fueron infructuosas. Finalmente, el foro primario dictaminó que el contrato suscrito entre las partes era uno válido y que la señora Báez no logró demostrar que dicho negocio jurídico fue cancelado por su parte. Por tales circunstancias, el foro primario la condenó al pago de $2,983.07 por concepto de deuda, más $500.00 en honorarios de abogados.

Inconforme con este dictamen, el 24 de junio de 2024, la señora Báez compareció ante esta Curia y le imputó al TPI la comisión de los siguientes errores:

Erró el Foro de Instancia como cuestión de hecho y de derecho al dictar sentencia declarando Ha Lugar la Demanda.

---

[9] *Íd.*, págs. 252-260.

Erró el foro de Instancia como cuestión de hecho y de derecho, al denegar la solicitud presentada para la conversión del trámite sumario a uno ordinario.

Conjuntamente con su recurso, la señora Baez presentó la *Transcripción Certificada del Juicio.*[10] Consecuentemente, mediante una *Resolución* que emitimos el 1 de julio de 2024, le concedimos diez (10) días a Sunnova para que presentara sus objeciones a la misma. En cumplimiento con nuestra orden, el 18 de julio de 2024, la Apelada presentó una *Moción en Cumplimiento de Resolución [...]* mediante la cual nos informó que no tenía objeciones a la transcripción presentada por la Apelante. El 24 de julio de 2024, Sunnova compareció con su *Alegato de la Parte Apelada*, mediante la cual, en esencia, negó que se hayan cometido los errores esgrimidos por la Apelante.

Con la comparecencia de ambas partes y tras un detenido estudio del expediente y la transcripción de la prueba oral vertida durante el juicio, procedemos a resolver.

## II.

### A. Los Contratos

El Art. 1042 del Código Civil enumera las fuentes de las obligaciones reconocidas por nuestro ordenamiento jurídico. Así, el referido artículo dispone que "[l]as obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia".[11] En particular, sobre las obligaciones de naturaleza contractual, el Art. 1206 establece que un "contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". 31 LPRA sec. 3371. Ahora

---

[10] *Íd.*, págs. 110-414.

[11] Art. 1042 del Código Civil de Puerto Rico de 1930, según enmendado, 31 LPRA sec. 2992, (en adelante, "Código Civil"). El referido Código Civil de Puerto Rico de 1930, según enmendado, fue derogado por el Código Civil de Puerto Rico de 2020 aprobado mediante la Ley Núm. 55 de 1 de junio de 2020. Para fines de la presente, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia ante nuestra consideración.

bien, para que un contrato sea fuente de obligaciones es necesario que concurran los siguientes requisitos: (1) consentimiento [válido] de los contratantes; (2) objeto cierto que sea materia del contrato, y (3) causa de la obligación que se establezca. Arts. 1213 y 1230 del Código Civil, 31 LPRA secs. 3451 y 3391; *Díaz Ayala et al. v. E.L.A.*, 153 DPR 675, 690-691 (2001). Habida cuenta de lo anterior, al concurrir los referidos elementos nace una obligación contractual válida, es decir, lo suscrito cobra vida jurídica.

Como es sabido, en nuestro ordenamiento jurídico impera el principio de la autonomía de la voluntad, en virtud del cual las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil, 31 LPRA sec. 3372; Véase, *Álvarez v. Rivera*, 165 DPR 1 (2005). Además, otro axioma que rige en nuestra jurisdicción es la libertad de contratación. Éste, entre otras cosas, permite que "[l]os contratos [sean] obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez". Art. 1230 del Código Civil, 31 LPRA sec. 3451. En otras palabras, como regla general, una obligación contractual cobra vida jurídica independientemente de la forma mediante la cual las partes finalmente concreten dicha obligación, salvo que por ley se exija – como requisito *ad solemnitatem* – una forma específica de otorgamiento para su validez.

De la misma forma, es un principio prevaleciente en nuestro sistema de derecho que las relaciones contractuales se rigen por el principio de *pacta sunt servanda*. El referido principio, estatuido en el Art. 1044 del Código Civil, establece que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". 31 LPRA sec. 2994; *PRFS v. Promoexport,* 187 DPR 42, 52 (2012). Como

corolario, luego de perfeccionado el contrato, las partes quedan obligadas no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Art 1210 del Código Civil, 31 LPRA sec. 3375. De manera que, los tribunales no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato cuando este es legal y válido y no contiene vicio alguno. *De Jesús González v. A.C.,* 148 DPR 255, 271 (1999).

### B. La apreciación de la prueba

La Regla 43.2 de Procedimiento Civil, 32 LPRA Ap. V. R. 43.2 establece en lo pertinente que "[l]as determinaciones de hecho basadas en el testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos."

Por lo que como norma general no hemos de intervenir, ni alterar, innecesariamente, las determinaciones de hecho formuladas por el foro primario "[l]uego de admitir y aquilatar la prueba presentada durante el juicio". *Suárez Cáceres v. Com. Estatal Elecciones,* 176 DPR 31, 65 (2009). No podemos "[d]escartar y sustituir las determinaciones tajantes y ponderadas del foro de instancia". *Íd.,* en las págs. 65-66. Nuestro esquema probatorio otorga deferencia a las determinaciones de hecho, la apreciación de la prueba testifical y las adjudicaciones de credibilidad que realiza el juzgador del foro primario. Como norma general, los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza ese foro. *Sucn. Rosado v. Acevedo Marrero,* 196 DPR 844, 917 (2016). Sin embargo, esa deferencia descansa en un marco de discreción y razonabilidad. *Citibank NA v. Cordero Badillo,* 200 DPR

724, 735 (2018). La discreción es "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *Medina Nazario v. McNeil Healthcare LLC, supra*, pág. 729. Así que, ese juicio discrecional "no es en función al antojo o voluntad de uno, sin tasa ni limitación alguna". *Santa Aponte v. Srio. Hacienda*, 105 DPR 750, 770 (1977). **Los tribunales revisores podremos sustituir el criterio que utilizó el foro primario por el nuestro únicamente cuando existen circunstancias extraordinarias en las que se pruebe que el foro primario actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción o en un error manifiesto o de derecho.** *Citibank NA v. Cordero Badillo, supra*, pág. 736.

El juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que o admiten cuestionamiento sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Por otro lado, un tribunal puede incurrir en abuso de discreción cuando el juez: (1) ignora sin fundamento algún hecho material importante que no podía pasar por alto, (2) concede demasiado peso a un hecho inmaterial y funda su decisión principalmente en ese hecho irrelevante, (3) a pesar de examinar todos los hechos del caso, hace un análisis liviano y la determinación resulta irrazonable. *Pueblo v. Sanders Cordero,* 199 DPR 827, 841 (2018); *Pueblo v. Custodio Colón,* 192 DPR 567, 588-589 (2015). Por último, un juzgador incurre en error manifiesto que justifica la intervención del tribunal apelativo cuando "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". *Pueblo v. Irizarry,* 156 DPR 780, 816 (2002).

Ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio. *Dye-Tex de P.R., Inc. v. Royal Ins. Co.*, 150 DPR 658, 662 (2000).

### C. *La Regla 60 de Procedimiento Civil*

La Regla 60 de Procedimiento Civil, *supra*, establece un proceso sumario de cobro de dinero, en el cual las demás reglas de procedimiento civil para trámites ordinarios aplican de manera supletoria, siempre que no menoscaben la disposición sumaria del asunto. *RMCA v. Mayol Bianchi*, 208 DPR 100, 107-108 (2021). El mecanismo provisto por la Regla 60 de Procedimiento Civil, *supra*, es uno de carácter sumario, cuya principal finalidad es imprimir celeridad al curso del procedimiento que al amparo de sus disposiciones atiende. La Regla 60, *supra*, provee un método especial para dirimir reclamaciones de cobro de dinero de cuantías que no excedan quince mil dólares ($15,000), provee de este modo, una pronta y ágil adjudicación en cuanto a este tipo de controversias y facilita, a su vez, el acceso a la maquinaria judicial. Precisamente, dado que la Regla 60 de Procedimiento Civil, *supra*, busca simplificar la adjudicación de la causa que atiende, el rigor de los preceptos ordinarios incluidos en las Reglas de Procedimiento Civil, le son aplicables de manera supletoria. Así pues, el foro primario está facultado para atender el día de la vista todas las cuestiones litigiosas y dictar sentencia. Véase, *Asoc. Res. Colinas Metro v. S.L.G.*, 156 DPR 88 (2002). En conformidad con lo anterior la Regla 60, *supra* dispone lo siguiente:

> La notificación-citación indicará la fecha señalada para la vista en su fondo, que se celebrará no más tarde de los tres (3) meses a partir de la presentación de la demanda, pero, nunca antes de quince (15) días de la notificación a la parte demandada. En la notificación se advertirá a la parte demandada que en la vista deberá exponer su posición

respecto a la reclamación, y que si no comparece podrá dictarse sentencia en rebeldía en su contra.

La parte demandante podrá comparecer a la vista por sí o mediante representación legal**. El Tribunal entenderá en todas las cuestiones litigiosas en el acto de la vista y dictará sentencia inmediatamente. Como anejo a la demanda, el demandante podrá acompañar una declaración jurada sosteniendo los hechos contenidos en la demanda o copia de cualquier otro documento que evidencie las reclamaciones de la demanda**.

Para la tramitación de un pleito conforme al procedimiento establecido en esta Regla, la parte demandante debe conocer y proveer el nombre y la última dirección conocida de la parte demandada al momento de la presentación de la acción judicial. De lo contrario, el pleito se tramitará bajo el procedimiento ordinario.

"[E]n el procedimiento sumario de la referida Regla 60 se prescinde de la contestación a demanda y del descubrimiento de prueba. Además, éste no considera la presentación de alegaciones tales como la reconvención y demanda contra terceros, entre otras". *RMCA v. Mayol Bianchi supra,* pág. 109*; Asoc. Res. Colinas Metro v. S.L.G., supra,* págs. 99-100. En lo pertinente a las defensas afirmativas, estas comprenden materia de naturaleza sustantiva y/o materia constitutiva de excusa, por la cual la parte demandada debe responder a las reclamaciones en su contra. *RMCA v. Mayol Bianchi supra,* pág. 110; *Presidential v. Transcaribe,* 186 DPR 263,280 (2012). "Las defensas afirmativas solo tienen un propósito defensivo, entiéndase, impedir que el reclamo [en contra de la parte demandada] prospere". *RMCA v. Mayol Bianchi supra,* pág 110 citando a *Bacardí Corp. Torres Arroyo,* 202 DPR 1014,1023 (2019)

Indistintamente de lo anterior, procede evaluar si los trámites procesales ante el TPI reflejan o no sin lugar a dudas, que luego de la notificación-citación, el tribunal ha continuado tramitando el caso, bajo el procedimiento ordinario de las Reglas de Procedimiento Civil. *Asoc. Res. Colinas Metro v. S.L.G., supra,* pág. 104.

Según surge de la precitada Regla 60, existen varias instancias en las cuales es viable convertir una causa de acción incoada bajo esta regla en un procedimiento ordinario, a saber: (1)

si la parte demandada demuestra que tiene una reclamación sustancial; (2) si, en el interés de la justicia, las partes solicitan que el pleito continúe bajo el trámite civil ordinario; y (3) si, partiendo de ese mismo interés, el tribunal *motu proprio* lo ordena. *RMCA v. Mayol Bianchi*, supra, pág. 108, citando a *Cooperativa v. Hernández Hernández*, 205 DPR 624, 637-638 (2020). Si bien ambas partes tienen derecho a solicitar la conversión del procedimiento, ello no implica que automáticamente la conversión deba ser concedida, sino que el foro de origen debe sopesar los méritos de la solicitud. *Cooperativa v. Hernández Hernández*, supra, pág. 637.

En una acción de cobro de dinero, la parte demandante tiene que probar ser la acreedora de una deuda vencida, líquida y exigible. *RMCA v. Mayol Bianchi*, supra, pág. 108; *Ramos y otros v. Colón y otros*, 153 DPR 534, 546 (2001). Sobre ese particular, el Tribunal Supremo de Puerto Rico definió que es *líquida* aquella deuda cierta y determinada, mientras que se considera *exigible* porque puede demandarse su cumplimiento. *Íd.* Es decir que, "al alegarse que la cuenta es 'líquida y exigible' se están exponiendo hechos, a saber: que el residuo de la cuantía ha sido aceptado como correcto por el deudor y que está vencido". *Íd.*, citando a *Guadalupe v. Rodríguez*, 70 DPR 958, 966 (1950). (Énfasis omitido).

El hecho de que la deuda sea líquida y exigible en una demanda sobre cobro de dinero al amparo de la Regla 60 de Procedimiento Civil, *supra*, es un elemento que, además de la notificación-citación, debe ser superada por la parte promovente para que el tribunal pueda atender todas las cuestiones litigiosas y dictar sentencia inmediatamente. *RMCA v. Mayol Bianchi*, supra, pág. 109; *Cooperativa v. Hernández Hernández*, supra, pág. 636, citando a *Asoc. Res. Colinas Metro v. S.L.G.*, supra, pág. 100.

**III.**

Expuesto el marco jurídico, y tras un estudio detenido tanto del expediente ante nos, así como de la transcripción de la prueba oral, procedemos a resolver. En síntesis, la Apelante alega como primer señalamiento de error, que el foro primario erró al declarar *Ha Lugar* la *Demanda* sobre cobro de dinero instada por Sunnova. Asimismo, en su segundo señalamiento de error, plantea que el foro *a quo* incidió al no convertir el procedimiento de cobro de dinero sumario en uno ordinario. No le asiste la razón. Veamos.

En su recurso, la señora Báez argumenta que en la presente controversia no existía un contrato válido que vinculara a las partes, pues hubo vicio en el consentimiento. De igual manera, aduce que, aun considerándose valido el contrato en cuestión, la Apelante solicitó su cancelación oportunamente, por lo cual Sunnova estaba impedida de cobrar su acreencia. De entrada, es preciso resaltar que, en el caso de marras, el foro primario aquilató tanto la prueba documental como testifical que se presentó en la vista en su fondo y a base de esto, formuló cincuenta y ocho (58) determinaciones de hechos, las cuales merecen deferencia.

Según se desprende del expediente y de la transcripción de la prueba oral, la señora Báez y Sunnova suscribieron un contrato intitulado *SunSave Easy Own.*[12] Dicho contrato, el cual fue presentado como prueba por la Apelada, establecía que la señora Báez debía pagar unas mensualidades de $177.10 por un periodo de 25 años.[13] Consono con lo anterior, el aludido contrato **fue firmado por la señora Báez el 13 de mayo de 2019.**[14] Esto último fue corroborado por el testimonio de la señora María Mota Salcedo ("señora Mota"), representante de Sunnova, quien atestó que la

---

[12] Dicho documento se admitió en evidencia como el Exhibit 2 de la parte demandante Véase la Transcripción de la Prueba Oral ("TPO"), pág, 327 del apéndice.

[13] Véase el Apéndice de la Apelante, págs. 21-60.

[14] *Íd.*, pág. 310, líneas 5-20.

firma de los contratos en Sunnova se hacían únicamente de manera virtual, por medio de una plataforma conocida como *Docusing*.[15] La señora Mota también detalló que para corroborar que, en efecto, la persona firmante lo haya hecho correctamente, Sunnova llevaba a cabo llamadas de validación en la cual se comunicaban con el cliente y se le realizan varia preguntas, entre estas, si firmó el contrato o no.[16]

Así pues, surge de la transcripción del juicio que, el 13 de mayo de 2019, el mismo día en que se registró la firma de la señora Báez, Sunnova realizó una llamada de validación.[17] Pese a que, en su testimonio, la Apelante negó haber firmado el contrato, en el juicio se logró presentar una grabación autorizada de la llamada de validación y se constató lo siguiente:

> Segunda Persona: "Okay". Y ha tenido tiempo para revisar y firmar su acuerdo, incluyendo las páginas de puntos importantes y entender todos los condiciones [sic] y los procedimientos de la instalación.
> Sra. Báez: "Yes".[18]

A lo largo de esta grabación se expuso que, en efecto, la señora Báez había firmado un acuerdo con Sunnova y además, estaba consciente de que se le iba a cobrar un monto mensualmente por el servicio. En ese sentido, el foro primario le dio credibilidad a esta prueba y de esta forma concluyó correctamente, que en el caso de autos existía un contrato válido que vinculaba a las partes de epígrafe. Ahora bien, en cuanto al planteamiento de la Apelante referente a la cancelación del aludido contrato, esta hace alusión a la siguiente clausula:

> Si usted o el Contratista terminan o cancelan este Acuerdo de Mejoras para el Hogar antes de la Fecha de Interconexión o 30 días después de que la instalación del Sistema sea completada si ésta fecha es anterior a la Fecha de Interconexión, el Contrato de Venta al Por Menor a Plazos, así como el Contrato de Garantía se darán por terminado. Si usted o el Acreedor o el Contratista terminan el Contrato de

---

[15] *Íd.*, pág. 300, líneas 8-12.
[16] *Íd.*, pág. 293 línea 23 a la pág. 294, líneas 1-12.
[17] *Íd.*, pág. 161 líneas 1-8; pág. 293 líneas 19-23 a la pág. 294, líneas 1-9.
[18] *Íd.*, pág. 225 línea 23 a la pág. 226, líneas 1-8.

> Venta al Por Menor a Plazos o el Contrato de Garantía, respectivamente, antes de la Fecha de Interconexión, este Acuerdo de Mejoras para el Hogar también se dará por terminado.[19]

No obstante, se desprende de la prueba presentada en el juicio que la fecha de interconexión fue el 25 de junio de 2019.[20] A partir de dicha fecha, Sunnova comenzó a cobrar la mensualidad pactada y de la misma forma la señora Baez efectuó los correspondientes pagos hasta febrero de 2020.[21] Conforme a la prueba desfilada y creída por el foro primario, fue hasta enero de 2020 que se registró alguna gestión para cancelar el contrario.[22] Nótese que esta fecha es posterior a la requerida por la cláusula previamente citada, por lo cual colegimos que el contrato nunca se canceló antes del impago de la señora Báez.

Toda vez que no encontramos las circunstancias extraordinarias para sustituir el criterio del foro primario y en vista de que no hallamos presentes los elementos de pasión, prejuicio o parcialidad en el actuar del foro apelado, corresponde darle entera deferencia a su dictamen. Por consiguiente, el foro *a quo* no incidió al declarar *Ha Lugar* la demanda sobre cobro de dinero instada por Sunnova y por consiguiente el primer señalamiento de error no se cometió.

Resuelto lo anterior, corresponde atender el segundo señalamiento de error. La Apelante sostiene que el foro primario debió haber convertido el pleito a uno de cobro de dinero ordinario. La razón de ello obedece a que requería de mayor tiempo para poder presentar adecuadamente sus defensas sobre incumplimiento de contrato por parte de la Apelada y así poder presentar una reconvención. No obstante, tras evaluar los méritos del caso, no

---

[19] *Íd.*, pág. 29.
[20] *Íd.*, pág. 165 líneas 5-11.
[21] *Íd.*, pág. 201 líneas 1-18.
[22] *Íd.*, pág. 132 líneas 18- 23 a la pág. 133, líneas 1-3.

encontramos indicios de la existencia de por parte de la Apelante a una reclamación sustancial. Por ello, el foro primario no incidió al mantener el presente pleito en uno sumario, por lo cual el segundo señalamiento de error no se cometió.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones